**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-4370**

_____

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

ERNEST JAMES MCDOWELL, JR.,

            Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.   Louise W. Flanagan, District Judge.  (5:10-cr-00296-FL-1)

_____

Argued:  January 29, 2014          Decided:  March 11, 2014

_____

Before MOTZ, KING, and DIAZ, Circuit Judges.

_____

Affirmed by published opinion.  Judge Motz wrote the opinion, in which Judge King and Judge Diaz joined.

_____

**ARGUED**: Robert Earl Waters, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.   Jennifer P. May-Parker, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF**: Thomas P. McNamara, Federal Public Defender, Stephen C. Gordon, Assistant Federal Public Defender, Bettina K. Roberts, Research and Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.   Thomas G. Walker, United States Attorney, Yvonne V. Watford-McKinney, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

Ernest James McDowell, Jr., appeals his 196-month sentence imposed pursuant to the Armed Career Criminal Act. He contends that the district court erred by relying on an uncertified criminal record check as proof that he committed a violent felony in New York more than forty years ago. Given the applicable burden of proof and our deferential standard of review, we affirm.

## I.

## A.

In August 2010, DEA agents authorized a confidential informant to buy heroin from McDowell, a suspected North Carolina drug dealer. The informant placed an order for fifteen bundles of heroin with a man believed to be McDowell's distributor.

After taking the informant's order, the distributor called McDowell, who promptly left his home, drove to a friend's apartment, picked her up, and began driving again. Soon thereafter, DEA agents stopped McDowell's car. A narcotics dog searched the exterior of the car and alerted the agents to the presence of drugs inside. The agents searched the car's interior, where they found heroin. They next searched the friend's apartment with her consent, finding more heroin

2

apparently belonging to McDowell. Then the agents obtained a search warrant for McDowell's home, where they found yet more heroin and a firearm.

In March 2011, McDowell pled guilty without a plea agreement to one count of possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) & 924.

B.

Prior to the sentencing hearing, McDowell's probation officer prepared a presentence report ("PSR"). Pursuant to Section 4B1.4 of the Sentencing Guidelines, the probation officer increased McDowell's recommended sentence in the PSR on the ground that he was an "armed career criminal" as defined by the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). McDowell's status as an armed career criminal yielded a Guidelines range of 188-235 months' imprisonment.

In recommending that McDowell be designated an armed career criminal, the probation officer concluded that three of McDowell's prior convictions met the ACCA's definition of a "violent felony." The Government located formal court judgments evidencing two of the three convictions. But the Government was unable to produce a formal judgment documenting the third -- a 1971 conviction in the Bronx for second degree assault.

3

Instead, the Government relied on a criminal record check obtained from the National Crime Information Center ("NCIC") database, which listed the 1971 assault among the crimes for which McDowell had been convicted.

The NCIC is a computerized index of criminal justice information available to, and updated by, federal, state, and local law enforcement agents. See National Crime Information Center, Fed. Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ncic/ncic (last visited Feb. 18, 2014) ("NCIC Website"). The FBI administers the NCIC, but law enforcement officials across the country can access the database to help them "apprehend fugitives," "locate missing persons," and "perform[] their official duties more safely." Id. As of 2011, the database contained 11.7 million records, including records of arrests and convictions. Id. To avoid misidentifying suspects who provide false names, the NCIC typically links suspects' criminal histories to their fingerprints. See Use and Management of Criminal History Record Information, Bureau of Justice Statistics 10 (2001).

The NCIC report at issue here consists of a five-page printout detailing McDowell's alleged criminal history. The report lists four different names for McDowell: "Michael Mc Dowell," "Ernist J. McDowell," "Micheal McDowell," and "James Mac Dowell." It also provides four different birthdays for

4

McDowell -- all inaccurate -- and two social security numbers. The report correctly details McDowell's birthplace, his height, his weight, and his hair color, among other identifying characteristics. And the report provides information about McDowell's arrests and convictions in New York State. As relevant here, the report indicates that McDowell pled guilty under the name "Michael Mc Dowell" to second degree assault in the Bronx in 1971, a conviction for which he received a sentence of four years' imprisonment.

## C.

At his sentencing hearing, McDowell objected to the probation officer's reliance on the NCIC report to establish the fact of the 1971 assault. He contended that the report, standing alone, did not suffice to prove that he committed that crime. McDowell emphasized that the alleged assault took place more than forty years earlier and that the record check referred to him as "Michael Mc Dowell" rather than by his real name, Ernest James McDowell, Jr.

The Government acknowledged that a certified court record of the 1971 conviction was "no longer available," but contended that NCIC reports are generally reliable and that considerable evidence corroborated this particular NCIC report. The Government pointed out that McDowell had been convicted of other crimes in the Bronx shortly before the 1971 assault, and that

5

Bronx officials therefore would not have misidentified him in 1971. Additionally, the Government noted that McDowell had been convicted of a federal crime in 1983 that would have resulted in a criminal background check revealing the 1971 conviction. If the 1971 conviction never took place, the Government argued, McDowell would have objected in 1983 rather than waiting another thirty years to do so. And McDowell's probation officer explained that McDowell had been convicted under the name "Michael" in 1970 -- a conviction McDowell did not contest -- suggesting that this was an alias he used at the time of the challenged 1971 conviction.

Although the NCIC report was never entered into the record, the district court relied on it to find that "the proof [was] sufficient" to show that McDowell committed the 1971 assault. Accordingly, the court sentenced McDowell as an armed career criminal to 213 months' imprisonment. On appeal, without addressing McDowell's contention that the NCIC report was fatally unreliable, we concluded that the district court erred by basing its sentence on a report never made part of the record. United States v. McDowell, 497 F. App'x 345, 348 (4th Cir. 2012) (unpublished). In light of the report's absence, we explained that "there was no 'evidence' in the record that McDowell was convicted for second-degree assault in 1971, only

argument before the district court." Id. We therefore vacated the sentence and remanded for resentencing.

On remand, the Government introduced the NCIC report, and again relied on it. In response, McDowell again argued that the NCIC record check constituted an "inherently unreliable" means of establishing an ACCA predicate offense. McDowell also asserted that the report at issue here was particularly unreliable because it misstated his name and listed four different and inaccurate birthdays.

The Government responded by noting that McDowell's PSR included "Iron Mike" as an alias for McDowell, indicating that Michael was a name "he owns and recognizes for himself." And McDowell's probation officer provided a statement, explaining that the NCIC compiles all names and birthdays that a defendant gives upon arrest; thus, the report's reference to McDowell's aliases and to his four different birthdays should not be taken as evidence of unreliability. The probation officer explained that he had spoken to an FBI analyst who "confirmed through both fingerprint [analysis] as well as New York [Department of Corrections] records" that the 1971 conviction belonged to McDowell. Accepting the court's invitation to ask questions of the probation officer, McDowell's counsel asked whether the probation officer knew who entered the information regarding the

7

1971 arrest into the NCIC database. The probation officer responded that he did not.

The district court then entered the NCIC report into the record. Given the Government's explanations as to its accuracy, the court concluded that it was "appropriate to rely on" the report because "[t]here is a lot that substantiates" it. Accordingly, the court once again designated McDowell an armed career criminal. The court then sentenced him to 196 months' imprisonment -- a somewhat shorter sentence than the initial sentence due to McDowell's good behavior in the interim.

## II.

The ACCA mandates a term of fifteen years to life imprisonment for felons convicted of unlawfully possessing a firearm after committing three "violent felon[ies]" or "serious drug offense[s]." 18 U.S.C. § 924(e). The Government bears the burden of proving by a preponderance of the evidence that a defendant committed a predicate violent felony -- the same standard that applies to any other sentencing factor. United States v. Harcum, 587 F.3d 219, 222 (4th Cir. 2009). We review a district court's legal conclusions at sentencing de novo and its factual findings for clear error. United States v. Farrior, 535 F.3d 210, 217 (4th Cir. 2008).

8

When a defendant objects to information in a PSR, the district court must "rule on the dispute" before imposing a sentence. Fed. R. Crim. P. 32(i)(3)(B). In resolving a dispute regarding the PSR, the court may consider information that "has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). The party objecting to information in a PSR has an "affirmative duty" to show that the information is incorrect. United States v. Terry, 916 F.2d 157, 162 (4th Cir. 1990); see also United States v. Randall, 171 F.3d 195, 210-11 (4th Cir. 1999).

On appeal, we afford considerable deference to a district court's determinations regarding the reliability of information in a PSR. We will not disturb a court's determination regarding the reliability of a PSR unless we are "left with the definite and firm conviction that a mistake has been committed." United States v. Harvey, 532 F.3d 326, 336 (4th Cir. 2008) (quotation marks omitted).

With these principles in mind, we turn to the case at hand, in which McDowell challenges his sentence on both evidentiary and constitutional grounds.

III.

McDowell initially contends that the NCIC report cannot establish, even by a preponderance of the evidence, the fact of the 1971 conviction.

Every court of appeals to address a similar argument in a published opinion has rejected it. All have concluded that a district court may use an NCIC report to help establish the fact of a prior conviction. Two appellate courts have held that an NCIC report alone may establish a predicate conviction. See United States v. Urbina-Mejia, 450 F.3d 838, 840 (8th Cir. 2006) (district court did not clearly err in concluding that NCIC report proved a prior conviction because defendant "provide[d] no evidence that the NCIC report [wa]s unreliable"); United States v. Marin-Cuevas, 147 F.3d 889, 895 (9th Cir. 1998) (district court did not err in finding prior conviction because defendant's probation officer obtained the information "from a reliable source [--] the computerized criminal history"). Another court has concluded that an NCIC report, together with a letter from a court clerk attesting to the conviction, sufficed to prove a prior conviction. United States v. Martinez-Jimenez, 464 F.3d 1205, 1212 (10th Cir. 2006). And a fourth court has held that an NCIC report may establish a prior conviction, but only if the district court makes additional findings that the

report is reliable.  United States v. Bryant, 571 F.3d 147, 155 (1st Cir. 2009).

McDowell distinguishes some of these cases and dismisses others as wrongly decided.  He raises concerns with respect to the reliability of NCIC reports in general and his report in particular.  We address each of these arguments in turn.

A.

First, McDowell suggests that NCIC reports are inherently too inaccurate to be relied on at sentencing.  To support this argument, he points to cases in which information included in an NCIC report was found to be false.  He notes that such reports lack the reliability of certified court records, which are created for the express purpose of memorializing the fact of a criminal conviction.  And he emphasizes that a goal of the NCIC is to help officers "perform[] their official duties more safely," NCIC Website, supra, from which he infers that the database errs on the side of overinclusivity.

Certainly, some case law does support McDowell's contention that the NCIC database is fallible.  See, e.g., Baker v. McCollan, 443 U.S. 137, 141 (1979) (criminal background check mistakenly attributed to defendant a crime actually committed by his brother); United States v. Kattaria, 553 F.3d 1171, 1177 (8th Cir. 2009) (en banc) (NCIC report mistakenly indicated that defendant's prior conviction involved a firearm); Finch v.

11

Chapman, 785 F. Supp. 1277, 1278–79 (N.D. Ill. 1992) (mistake in NCIC database led twice to plaintiff's wrongful arrest).

But, although McDowell purports to raise an empirical question regarding the accuracy of NCIC reports, he provides no evidence to suggest that the NCIC database proves inaccurate with any significant frequency. Indeed, when asked at oral argument whether he could cite statistical evidence regarding the accuracy of the NCIC database, McDowell's counsel pointed to Urbina-Mejia, 450 F.3d at 839, which recounted a probation officer's remark that one out of two hundred NCIC reports he had encountered in his career was inaccurate. Anecdotal evidence of a 99.5% accuracy rate fails to establish categorical unreliability; rather, it severely undermines McDowell's claim that NCIC reports cannot be trusted.

Moreover, we note that the limited available evidence suggests that the NCIC database is generally (albeit not always) accurate. See Improving Access to and Integrity of Criminal History Records, Bureau of Justice Statistics 2 (2005) (estimating 0.1% error rate in firearm background checks, which rely on the NCIC); Electronic Record Systems and Individual Privacy, Fed. Gov't Info. Tech., 133-34 (June 1986) (audit of five states' records indicated that 5.5% of NCIC wanted persons entries were invalid).

The pervasive use of NCIC reports throughout the criminal justice system further indicates that such reports may be trusted. Courts use NCIC reports to make bail and pretrial release decisions; prosecutors rely on NCIC reports at trial to prove that witnesses committed a relevant prior crime; and probation officers use NCIC reports to establish defendants' criminal histories at sentencing. See Use and Management of Criminal History Record Information, Bureau of Justice Statistics 18-20 (2001); United States v. Wilson, No. 09-20138, 2009 WL 3818192, at *1 (E.D. Mich. Nov. 13, 2009) (NCIC report used to introduce prior-crime evidence against defendant at trial); United States v. Townley, 472 F.3d 1267, 1277 (10th Cir. 2007) (NCIC report used to establish defendant's criminal history at sentencing). In view of this widespread use of NCIC reports, we cannot agree with McDowell's blanket assertion that NCIC reports are categorically unreliable.[*]

---

[*] The Supreme Court has cautiously authorized the police to rely on computerized record checks -- even ones that later prove inaccurate -- to execute warrants. In Arizona v. Evans, 514 U.S. 1 (1995), police arrested and searched a defendant based on a record check mistakenly indicating that he was subject to an outstanding arrest warrant. The Court declined to address whether the arrest itself violated the Fourth Amendment, id. at 6 n.1, but concluded that evidence discovered during the arrest need not be suppressed, id. at 16. Three Justices (on whose concurrence the majority disposition depended) emphasized that police may rely on computer records only to the extent that such reliance is reasonable. They explained that while the police "are entitled to enjoy the substantial advantages [computer-
(Continued)

13

B.

Alternatively, McDowell argues that, even if courts can generally trust NCIC reports, the specific report at issue here manifests such blatant indicia of unreliability that the district court clearly erred in crediting it. He contends that the NCIC report's inaccurate statement of his name and birthday and the passage of forty years since the alleged New York conviction renders the report unworthy of credence.

These issues do cast some doubt on the report's accuracy. But, as noted above, the Government provided unrebutted explanations regarding each of the report's alleged defects. The PSR noted that McDowell answered to the street name of "Iron Mike" and that he occasionally used the alias "Michael." The probation officer clarified that an NCIC report includes any names and birthdays provided by the defendant upon arrest -- including false ones. The probation officer also stated that he had spoken with an FBI agent who confirmed that the NCIC report linked McDowell to the 1971 assault through fingerprint analysis. In addition, the Government pointed out that McDowell

based recordkeeping] technology confers," they may not "rely on it blindly." Id. at 17 (O'Connor, J., concurring). Because there was no reason to doubt the accuracy of the record check at issue in that case, the concurrence agreed that the police acted reasonably in relying on it. Accord Herring v. United States, 555 U.S. 135, 146 (2009).

14

had been convicted of other crimes in the Bronx under the alias "Michael" shortly before 1971, rendering the subsequent assault conviction more likely. And finally, the Government noted that McDowell was convicted of a federal crime in 1983 -- a conviction that would have resulted in a criminal background check revealing the 1971 conviction -- and that if he had a legitimate basis for challenging the 1971 conviction, would have done so then.

These explanations vary in their persuasiveness, and, even taken together, fail to erase all doubts regarding the accuracy of the NCIC report at issue here. But the district court did not clearly err in crediting them. Together, these explanations sufficiently substantiated the information in the NCIC report to permit the court to conclude by a preponderance of the evidence that McDowell committed the 1971 assault. Indeed, given that the district court elicited facts rebutting McDowell's objections to the NCIC report and corroborating the information contained in it, the district court's ruling would seem to satisfy even the First Circuit's requirement that the sentencing court make an "additional inquiry into the reliability" of an NCIC report before relying on it. Bryant, 571 F.3d at 155.

We need not and do not hold that a contested NCIC report standing alone would suffice to establish the fact of a prior conviction. We hold only that the district court did not

15

clearly err in finding that this report, in addition to the corroboration provided by the Government, established the fact of the 1971 conviction by a preponderance of the evidence.

IV.

McDowell also ascribes constitutional error to the proceedings below. He contends that in applying the preponderance-of-the-evidence standard to establish the fact of his prior conviction, the district court violated his Sixth Amendment right to have a jury find each element of his offense beyond a reasonable doubt. At oral argument, the Government conceded that the NCIC report would not suffice to prove the fact of McDowell's 1971 conviction beyond a reasonable doubt.

Normally, the Sixth Amendment requires any fact that raises the statutory maximum or mandatory minimum penalty for a crime to "be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (announcing this rule with respect to statutory maximums); see also Alleyne v. United States, 133 S. Ct. 2151, 2163 (2013) (extending the rule to mandatory minimums). Adherence to the demanding reasonable-doubt standard "reflect[s] a profound judgment about the way in which law should be enforced and justice administered." Apprendi, 530 U.S. at 478 (quoting In re Winship, 397 U.S. 358, 361-62 (1970)) (alteration in original).

16

Because an ACCA enhancement increases both a defendant's statutory maximum and mandatory minimum penalties, the Sixth Amendment would seem to require the Government to prove an ACCA predicate felony beyond a reasonable doubt. The Supreme Court, however, has recognized an exception to the general Sixth Amendment rule: a jury need not find the "fact of a prior conviction" beyond a reasonable doubt. Apprendi, 530 U.S. at 490. Instead, the Court has held that the Sixth Amendment permits a judge to find the fact of a prior conviction by a mere preponderance of the evidence, even if this fact raises the statutory maximum or minimum penalty for the current offense. Almendarez-Torres v. United States, 523 U.S. 224, 247 (1998).

The Supreme Court has since described the Almendarez-Torres holding as "at best an exceptional departure" from the normal Sixth Amendment rule. Apprendi, 530 U.S. at 487. The Court has justified this "departure" on the ground that the defendant in Almendarez-Torres "did not challenge the accuracy of [the prior conviction] in his case" and that the prior conviction arose "pursuant to proceedings with substantial procedural safeguards of their own." Id. at 488. The Court reasoned that these twin protections "mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a 'fact' increasing punishment beyond the maximum of the statutory range." Id.

17

Four Justices dissented in Almendarez-Torres. Justice Thomas, who joined the Almendarez-Torres majority, has subsequently stated that he believes the case was wrongly decided. See Shepard v. United States, 544 U.S. 13, 28 (2005) (Thomas, J., concurring). Moreover, the Supreme Court's recent characterizations of the Sixth Amendment are difficult, if not impossible, to reconcile with Almendarez-Torres's lonely exception to Sixth Amendment protections. See Alleyne, 133 S. Ct. at 2160 ("any facts that increase the prescribed range of penalties to which a criminal defendant is exposed are elements of the crime" that a jury must find beyond a reasonable doubt (quotation marks omitted)); Shepard, 544 U.S. at 25 ("[T]he Sixth and Fourteenth Amendments guarantee a jury standing between a defendant and the power of the State, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence.").

Notwithstanding these recent cases, however, Almendarez-Torres remains good law, and we may not disregard it unless and until the Supreme Court holds to the contrary. See Agostini v. Felton, 521 U.S. 203, 237 (1997) (if a Supreme Court precedent directly controls, "yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court

18

the prerogative of overruling its own decisions" (quotation marks omitted)).

But even as we reject McDowell's Sixth Amendment claim, we feel bound to acknowledge its force. The rationales justifying the Almendarez-Torres exception are entirely absent in this case. Unlike Almendarez-Torres, McDowell does not concede that his prior conviction in fact occurred. Nor was there any assurance that the disputed 1971 conviction arose "pursuant to proceedings with substantial procedural safeguards of their own" that mitigate McDowell's Sixth Amendment concerns. See Apprendi, 530 U.S. at 488. Application of the Almendarez-Torres exception to this case thus untethers the exception from its justifications and lays bare the exception's incompatibility with constitutional principles that are by now well settled.

V.

The district court increased McDowell's statutory maximum sentence on the basis of evidence that indicated -- but, as the Government concedes, did not prove beyond a reasonable doubt -- that McDowell committed a crime forty years earlier. Several members of the Supreme Court have expressed their belief that the Sixth Amendment prohibits this practice. This case powerfully testifies why reconsideration of the Almendarez-Torres exception may be warranted. Under current law, however,

19

a court may find the fact of a prior conviction by a preponderance of the evidence. Applying this standard, the district court did not clearly err in concluding that McDowell committed the 1971 assault. The judgment of the district court is therefore

AFFIRMED.