**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4110

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHARLES YORK WALKER, JR.,

Defendant – Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Joseph R. Goodwin, District Judge.  (2:16-cr-00174-1)

Argued:  January 31, 2019                          Decided:  April 25, 2019

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.  Judge Niemeyer wrote a separate concurring opinion.

**ARGUED:**  Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Steven Loew, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:** Christian M. Capece, Federal Public Defender, Lex A. Coleman, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Michael B. Stuart, United States Attorney, W. Clinton Carte, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

KING, Circuit Judge:

Defendant Charles York Walker, Jr., appeals from drug and firearms convictions and his resulting 120-month sentence in the Southern District of West Virginia. After the district court rejected a plea agreement under which Walker would have pleaded guilty to a single count of possession with intent to distribute heroin, Walker pleaded guilty — without a plea agreement — to three drug offenses of a four-count indictment. A jury trial was then conducted on the firearms charge in the fourth count of the indictment and Walker was found guilty thereof. On appeal, Walker contends that the court erred in three respects: by rejecting his plea agreement with the United States; in sustaining the prosecution's peremptory strike of an African-American woman from the jury; and in calculating his advisory Guidelines range. As explained below, we affirm the criminal judgment.

I.

A.

In early 2016, several law enforcement agencies in Kanawha County, West Virginia, were investigating drug trafficking in a task force called the Metropolitan Drug Enforcement Network Team ("MDENT"). *See* J.A.S. 669-70.[1] Between April and July 2016, MDENT used confidential informants to conduct seven controlled buys of heroin

---

[1] Citations herein to "J.A.__" and "J.A.S.__" refer to the contents of the Joint Appendix and the Sealed Joint Appendix filed by the parties in this appeal.

from Walker. On two of those occasions, the heroin purchased from Walker contained the opioid fentanyl.[2]

On July 14, 2016, MDENT officers arrested Walker in Charleston, West Virginia. They searched Walker's person in connection with his arrest and recovered small amounts of marijuana, cocaine, and heroin. That same day, the MDENT officers executed a search warrant at an apartment in Charleston, which informants had linked to Walker's drug business. The officers who conducted the search found and seized, inter alia, a .38-caliber Rossi handgun, a .45-caliber Kimber handgun, five boxes of .45-caliber ammunition, a set of drug scales, and two cell phones, one of which belonged to Walker. The officers then obtained and executed a search warrant for Walker's cell phone, from which they seized text messages concerning drug activity, plus photos that depicted Walker holding the .45-caliber Kimber pistol. Two days before Walker's arrest, the MDENT officers learned from an informant that Walker "pistol-whipped" a man named Corns, who owed Walker for drugs. *See* J.A.S. 674. After Walker's arrest, the officers interviewed Corns, who admitted purchasing illegal drugs from Walker and said that Walker had beaten him with a .38-caliber revolver.

On September 13, 2016, a federal grand jury in Charleston returned a six-count indictment against Walker. The indictment alleged three counts of distributing heroin

---

[2] According to the DEA, fentanyl is a synthetic opioid that is "80-100 times stronger than morphine." *See* U.S. Drug Enforcement Admin., *Drug Facts: Fentanyl*, www.dea.gov/factsheets/fentanyl (last visited Apr. 10, 2019). Fentanyl is sometimes added to heroin "to increase its potency," which also increases the risk of an overdose death. *See id*.

3

and two counts of distributing fentanyl, in violation of 21 U.S.C. § 841(a)(1), plus a single charge of possessing the two firearms as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

B.

1.

Four months after he was indicted, in January 2017, Walker entered into a plea agreement with the United States. Pursuant thereto, Walker agreed to plead guilty to a criminal information that charged him with a single count of possession with intent to distribute heroin, in contravention of 21 U.S.C. § 841(a)(1). After the Government filed the information, the district court conducted a plea hearing on January 26, 2017. The court accepted Walker's guilty plea but deferred acceptance of the plea agreement pending a presentence report (the "PSR").

The Probation Office prepared the PSR by April 2017, and the parties thereafter submitted sentencing memoranda to the district court. Based on the plea agreement, the PSR recommended a base offense level of 12, the lowest possible level for offenses involving heroin or fentanyl. The PSR also recommended a 2-level enhancement for possession of a firearm and a 2-level reduction for acceptance of responsibility, for a total offense level of 12. The PSR determined that Walker's criminal history category was IV, resulting in an advisory Guidelines range of 21 to 27 months.

Both parties objected to aspects of the PSR. The Government sought an additional enhancement because of Walker's attack on Corns, and Walker challenged the proposed

4

firearm enhancement. The Government sought a sentence of between 24 and 30 months, while Walker requested a sentence of 12 months plus a day.

2.

On June 26, 2017, the district court conducted another hearing and rejected the plea agreement.[3] As the court explained, the PSR revealed a number of troubling facts. Walker, who was 38 years old, had several juvenile theft convictions and about 18 criminal convictions as an adult, and several of his convictions related to drugs and firearms. The court emphasized that, despite Walker's multiple convictions — and myriad other charges not pursued to conviction — he had consistently received lenient sentences and had served only about eight years in prison. The court also reviewed and emphasized Walker's violent history. For example, the PSR revealed that Walker had pistol-whipped three different persons (including Corns). Additionally, the court considered a separate incident that resulted in a domestic battery charge against Walker.

Of particular concern to the district court was the nature of the drug offenses in the indictment, that is, trafficking in heroin and fentanyl. The court underscored the terrible toll that those drugs had exacted on the entire country — and on West Virginia in particular — describing in detail the scale and cost of the "heroin and opioid crisis." *See* J.A. 86. Drawing on a November 2016 report from the DEA, the court emphasized that

---

[3] The district court explained from the bench in substantial detail the bases for its rejection of the plea agreement. *See* J.A. 79-100. The court also filed a written opinion memorializing that explanation. *See United States v. Walker*, No. 2:17-cr-10 (S.D. W. Va. June 26, 2017), ECF No. 36.

5

an average of 91 Americans died from opioid overdoses every day.  Locally, it was reported that 844 West Virginians died of drug overdoses in 2016.

Having recited the impact of the nation's opioid epidemic, the district court also expounded on its concerns about excessive plea bargaining in the federal courts.  The court outlined justifications for the extensive plea bargaining used in the federal system and rejected as empirically unsound the common rationale of "overburdened prosecutors and judges."  *See* J.A. 93.  For example, the court observed that, despite an increase in the number of federal prosecutors in the past 40 years, the number of federal criminal trials had significantly decreased during that period (from approximately 8500 to 2000 trials per year).  The court concluded:

> Because the most common justifications for plea bargaining no longer have any substantial heft, the counterweight of the people's general interest in observing and participating in their government requires close consideration of proffered plea bargains in every case.  I conclude that the courts should reject a plea agreement upon finding that the plea agreement is not in the public interest.

*Id*. at 96.  The court then identified four factors that should be used to assess whether a plea agreement is in the public interest:  (1) "the cultural context surrounding the subject criminal conduct"; (2) "the public's interest in participating in the adjudication of the criminal conduct"; (3) the possibility of "community catharsis" absent the transparency of a jury trial; and (4) whether, in light of the PSR, it appeared that the "motivation" for the plea agreement was "to advance justice" or to "expediently avoid trial."  *Id*. at 97-98.

Applying those factors to Walker's plea proceedings, the district court determined that:  (1) "the cultural context is a rural state [West Virginia] deeply wounded by . . .

6

heroin and opioid addiction"; (2) "the public has a high interest in [the] adjudication of heroin and opioid crimes" because of the severity of the opioid crisis in West Virginia; (3) a jury trial could permit the "peaceful expression of community outrage" at Walker's "vicious criminal acts"; and (4) the principal motive behind Walker's plea agreement was convenience. *See* J.A. 97-98. Consequently, the court rejected the plea agreement reached between Walker and the United States.

In response, Walker's counsel acknowledged the district court's view of Walker's case but challenged its contention that a jury trial would be preferable to resolution by the plea agreement. Walker's lawyer also disputed the proposition that the plea agreement had been reached "out of expedience," and emphasized what he called the relatively minor drug quantities involved in Walker's offenses. *See* J.A. 102-03. The lawyer concluded by asking the court to "at least evaluate reconsidering with respect to [Walker's] case." *Id.* at 103. The court declined to alter its position, however, and scheduled a hearing to permit Walker to withdraw his guilty plea. Walker withdrew his guilty plea two days later, on June 28, 2017.

Four months thereafter, in October 2017, the grand jury returned a superseding indictment that charged Walker with two counts of distributing heroin, one count of distributing fentanyl, and a single charge of possessing firearms as a convicted felon. In the course of addressing pretrial motions, the district court denied Walker's motion to sever the firearms charge from the drug charges. On November 7, 2017, Walker pleaded guilty — without a plea agreement — to the three drug distribution offenses in the superseding indictment. That same day, Walker went to trial on the firearms charge.

7

3.

During the jury selection proceedings, Walker — who is black — objected to the prosecution's peremptory strike of juror No. 22, a black woman. Walker invoked the Supreme Court's 1986 decision in *Batson v. Kentucky*, which established the constitutional principle that prosecutors may not use a peremptory strike to remove a potential juror solely on account of race. *See* 476 U.S. 79, 85-86 (1986).[4] As Walker's lawyer explained to the trial court, juror No. 22 was "the only African-American that was on this whole [jury] panel." *See* J.A. 156. The court then asked the Government if it could show a race-neutral reason for its strike of juror No. 22. The prosecutor responded that:

> [W]e narrowed it down to three factors that we looked at for striking the women: Whether they were married, their age and whether they had any kids. And juror No. 22 is not married, she's younger than the average, and she has no children. So those were the three factors that we looked at in striking the women on the jury.

*See id.* at 157. The court acknowledged the Government's "nondiscriminatory reason" for striking juror No. 22 and asked Walker if he had a response. *Id.* Walker's lawyer replied:

> I've heard the explanation. I'm not sure it's rational[ly] related to what we're picking a jury to do here. I don't have everyone else who was struck

_____

[4] Jury selection proceedings in federal court authorize each party to use a specific number of "peremptory challenges" to excuse prospective jurors. *See* Fed. R. Crim. P. 24(b). Such challenges are a "historical prerogative" of each side in a trial, and permit a party to strike a prospective juror "without a reason stated." *See Miller-El v. Dretke*, 545 U.S. 231, 238 (2005). Peremptory strikes contrast to "for cause" strikes, which generally seek to exclude prospective jurors for lack of impartiality. *See Skilling v. United States*, 561 U.S. 358, 395-96 (2010) (discussing "for cause" strikes predicated on bias).

> to go back through right this second and compare if that logic was borne out or not.  I still submit we need an African-American on this jury given the race of the defendant.

*Id*.  The court then explained that "we've addressed the [*Batson*] issue as required by law," and asked the parties if they had any "other objections to jury selection."  *Id*. at 157-58.  The lawyers had no further objections and the jury was sworn.

After two days of trial, the jury convicted Walker of the only offense tried: possession of a firearm by a convicted felon, in violation of § 922(g)(1) of Title 18.  By its verdict, the jury found that Walker illegally possessed the .38-caliber Rossi and the .45-caliber Kimber.

4.

On December 15, 2017, Walker moved to vacate the verdict and requested a new trial based on his *Batson* objection.  Walker's motion asserted that the Government's reasons for peremptorily striking juror No. 22 were a pretext for discrimination.  To support that proposition, Walker argued that four white women were selected to serve on the jury, one of whom was younger than juror No. 22 and one of whom was divorced (and thus — like juror No. 22 — unmarried).  The district court denied Walker's motion as untimely and did not further address the *Batson* challenge.

Prior to sentencing, a probation officer prepared another presentence report (the "second PSR"), applying the 2016 edition of the Guidelines.  The second PSR grouped Walker's three drug convictions and calculated an adjusted offense level of 12 for those counts.  With respect to the firearms conviction, the PSR recommended an adjusted offense level of 28.  The recommended offense level resulted from a base offense level of

9

20; a 2-level enhancement for possessing a stolen firearm (namely, the .38-caliber Rossi handgun); another 2-level enhancement for obstruction of justice; and a 4-level enhancement for possessing and using a firearm in connection with another felony offense, that is, the pistol-whipping assault of Corns.  The second PSR combined the two offense groups (i.e., the drug offenses and the firearms offense) and arrived at the total offense level of 28.  It also calculated a criminal history category of IV.  The second PSR thus recommended an advisory Guidelines range of 110 to 137 months.

The district court conducted Walker's sentencing hearing on February 1, 2018.  During the hearing, Walker objected to the stolen firearm enhancement.  More specifically, he contested the evidence showing that the .38-caliber Rossi had been stolen.  According to Walker, the evidence consisted solely of a report from the National Crime Information Center (the "NCIC").  He argued that the NCIC report alone was insufficient to satisfy the Government's burden with respect to the enhancement.  In response, the Government offered to present the sentencing court with evidence from an MDENT officer who had contacted the owner of the Rossi firearm and confirmed that it was stolen.  The court declined the offer of further evidence and overruled Walker's objection.  In so ruling, the court relied on an Eleventh Circuit decision that deemed an NCIC report sufficient support for a stolen firearm enhancement.  *See United States v. Saunders*, 572 F. App'x 816, 817 (11th Cir. 2014).  The court also invoked a Fourth Circuit decision emphasizing the trustworthiness of NCIC reports.  *See United States v. McDowell*, 745 F.3d 115, 121-22 (4th Cir. 2014).  The court emphasized that Walker had

10

failed to show that the NCIC report was inaccurate, or to otherwise cast doubt on its reliability.

After ruling on additional objections, the district court adopted the second PSR's recommendation of an advisory Guidelines range of 110 to 137 months. In imposing a sentence of 120 months, the court recited that it "want[ed] to make it absolutely clear" that it would impose the same sentence "without regard to the advice of the [G]uidelines." *See* J.A. 559. The court carefully applied the 18 U.S.C. § 3553(a) sentencing factors in explaining the 120-month sentence.

Walker has noted a timely appeal from the criminal judgment, and we possess appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

Walker pursues three appellate challenges to the criminal judgment entered in the district court. First, he contends that the court abused its discretion in rejecting his plea agreement with the United States, in that the court predicated its decision on a broad and ill-defined policy that disfavors plea bargaining generally.[5] Second, Walker contests the court's denial of his *Batson* challenge with respect to juror No. 22. Third, Walker argues that the court erred in calculating his advisory Guidelines range, specifically with respect to the stolen firearm enhancement. We address those contentions in turn.

---

[5] Although Walker contests the district court's rejection of his plea agreement, the Government agrees with the challenged ruling. It thus contends that the court did not abuse its discretion in rejecting the plea agreement.

11

A.

1.

In challenging the district court's rejection of his plea agreement, Walker does not dispute that the court adhered to the procedural steps that govern such agreements under Rule 11 of the Federal Rules of Criminal Procedure. That is, the court properly accepted Walker's plea of guilty, deferred its acceptance of the plea agreement until it had reviewed the PSR, and — after rejecting the plea agreement — permitted Walker to withdraw his guilty plea. What Walker contests on appeal are the court's reasons for rejecting the plea agreement.[6]

This Court has indicated that a district court's rejection of a plea agreement should be reviewed on appeal for abuse of discretion. *See United States v. Jackson*, 563 F.2d 1145, 1145 (4th Cir. 1977). And our sister circuits consistently review such rulings under that deferential standard.[7] Accordingly, we will review this issue for abuse of discretion.

---

[6] The Government contends that Walker waived his appellate challenge to the rejection of his plea agreement because he later pleaded guilty to the drug charges, and also because he refused to plead guilty to the firearm charge. *See* Br. of Appellee 18, 20. Aside from the Catch-22 created by the Government's position, it offers no controlling authority to support either proposition. Moreover, the appellate courts have generally permitted a defendant to challenge the rejection of a plea agreement even if another agreement was ultimately reached. *See, e.g.*, *United States v. Scott*, 877 F.3d 42, 47 (1st Cir. 2017) ("Nothing in Rule 11 requires (or even suggests) that a defendant only gets one bite at the [plea] negotiation apple.").

[7] Most of the courts of appeals have adopted the rule that a district court's rejection of a plea agreement is reviewed for abuse of discretion. *See United States v. Cota-Luna*, 891 F.3d 639, 647 (6th Cir. 2018); *United States v. Vanderwerff*, 788 F.3d 1266, 1276-77 (10th Cir. 2015); *United States v. Brown*, 595 F.3d 498, 521 (3d Cir. 2010); *In re Morgan*, 506 F.3d 705, 708 (9th Cir. 2007); *United States v. Jeter*, 315 F.3d (Continued)

Criminal Rule 11 is the starting point for evaluating a guilty plea in federal court. But, as our sister courts have recognized, Rule 11 does not establish criteria to guide a district court's discretion with respect to accepting or rejecting a plea agreement. *See, e.g.*, *In re Morgan*, 506 F.3d 705, 710 (9th Cir. 2007); *see also* Fed. R. Crim. P. 11 advisory committee's note to 1974 amendment (explaining that acceptance or rejection of plea agreement "is left to the discretion of the individual trial judge"). Nevertheless, the fundamental principles of our judicial system ensure that the court's discretion is not limitless. A court could not, for example, exercise its authority in an arbitrary or irrational manner. *See, e.g.*, *United States v. Dorman*, 496 F.2d 438, 440 (4th Cir. 1974) (affirming rejection of nolo contendere plea because ruling "was not arbitrary or capricious"). And, quite obviously, a court could not reject a plea agreement based on an invidious consideration such as race, sex, or religion. *See, e.g.*, *United States v. Johnson*, 410 F.3d 137, 151 (4th Cir. 2005) (confirming that a sentence may never be "based on a constitutionally impermissible factor such as race").[8]

---

445, 447 (5th Cir. 2002); *United States v. Shepherd*, 102 F.3d 558, 561 (D.C. Cir. 1996); *United States v. Greener*, 979 F.2d 517, 519 (7th Cir. 1992).

[8] In *United States v. Jackson* in 1977, our Judge Field reviewed the advisory committee notes and a congressional report regarding the 1974 revisions to Rule 11 and concluded that "each individual judge is free to decide whether, and to what degree, he will entertain plea bargains." *See* 563 F.2d at 1148; *see also United States v. Stamey*, 569 F.2d 805, 806 (4th Cir. 1978) (ruling that "the district court had no duty to permit plea bargaining," and thus did not err in declining to consider a plea agreement). Our decisions in *Jackson* and *Stamey*, however, do not control our analysis of Walker's appeal. Those decisions addressed the blanket rejection of plea bargaining, whereas in these proceedings the district court was evaluating Walker's plea agreement.

Acknowledging that a trial court does not possess unbounded discretion to reject a plea agreement, we will discuss factors that guide an exercise of that discretion. We will then apply those factors to the rejection of Walker's plea agreement.

2.

a.

Several factors are available that assist a district court's discretion in deciding whether to reject a plea agreement. Importantly, the principles that generally inhere in discretionary rulings apply to the rejection of a plea agreement. That is, a district court is not entitled to base its decision on arbitrary or irrational factors. *See, e.g.*, *United States v. Cota-Luna*, 891 F.3d 639, 647 (6th Cir. 2018) (emphasizing that a court considering a plea agreement must "rationally construct a decision" based on "all relevant factors"). To ensure the existence of sound reasons for rejection of a plea agreement, and to facilitate appellate review, the rejection and its justification should be on the record. *See, e.g.*, *United States v. Kraus*, 137 F.3d 447, 453 (7th Cir. 1998) (requiring court to "state on the record its reasons for rejecting a plea agreement").

Moreover, the bases for a court's rejection of a plea agreement must pertain to the specific agreement at hand, and the court should not rely on extraneous considerations or broad categorical determinations. Indeed, failure to consider the specific agreement would constitute an abdication — and hence an abuse — of discretion. *See In re Morgan*, 506 F.3d at 712 (explaining that "when a court establishes a broad policy based on events unrelated to the . . . case before it, no discretion has been exercised") (internal quotation marks and alterations omitted). Additionally, requiring a court to focus its

14

analysis on the relevant plea agreement minimizes the possibility that the court could interfere with plea negotiations, in contravention of Rule 11(c)(1). *See Kraus*, 137 F.3d at 453-54.

A district court may always consider whether a plea agreement is "too lenient," in light of the defendant's criminal history or the relevant offenses. *See In re Morgan*, 506 F.3d at 711; *acc. United States v. Smith*, 417 F.3d 483, 487 (5th Cir. 2005) (affirming rejection of plea agreement as "unduly lenient"). Conversely, a court can reject a plea agreement that it sees as too harsh. *See United States v. Skidmore*, 998 F.2d 372, 376 (6th Cir. 1993). Some courts have framed the inquiry as suggested by the Guidelines, which encourage the acceptance of a plea agreement if its provisions "adequately reflect the seriousness of the actual offense behavior and . . . accepting the agreement will not undermine the statutory purposes of sentencing." *See* USSG § 6B1.2. Thus, a court should carefully weigh whether the plea agreement adequately reflects the defendant's misconduct and serves the objectives of sentencing. *See, e.g.*, *Smith*, 417 F.3d at 487.

Importantly, a district court should also weigh whether the plea agreement is in the public interest. *See In re Morgan*, 506 F.3d at 712; *United States v. Godwin*, 272 F.3d 659, 679 (4th Cir. 2001) ("The proper role of a trial judge, most simply, is to see that justice is done in the cases heard before him." (internal quotation marks omitted)). And the public interest assessment should be predicated on the circumstances of the case. *See United States v. Vanderwerff*, 788 F.3d 1266, 1277 (10th Cir. 2015) (disallowing blanket policy preference as basis for rejecting plea agreement); *In re Morgan*, 506 F.3d at 711-12 (holding that courts "must consider individually every sentence bargain presented to

15

them"). Of additional importance, a court should always consider any danger the defendant might pose to the public. *See, e.g.*, *United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977) (affirming rejection of plea agreement where sentence did not reflect defendant's "dangerous character").

The foregoing is not an exhaustive review of the factors that guide a district court's assessment of a plea agreement. At bottom, the court should articulate a rational justification for its decision after weighing all the relevant circumstances. *See Cota-Luna*, 891 F.3d at 647. And, in so doing, the court must accord due respect to the prosecutorial prerogatives involved in charging decisions, thus ensuring that the separation of executive and judicial powers is not infringed. *See, e.g.*, *Vanderwerff*, 788 F.2d at 1271-72 (explaining that "concerns relating to the doctrine of separation of powers counsel hesitancy before second-guessing prosecutorial choices" in plea bargaining). Having identified the pertinent principles, we turn to Walker's plea agreement issue.

b.

In this appeal, Walker contends that the district court's reasons for rejecting his plea agreement with the United States constitute an abuse of discretion. More specifically, Walker argues that the court improperly based its rejection on a vague policy that generally disfavors plea agreements, that the court's policy against such agreements interferes with the prerogatives of prosecutors and defense lawyers, and that the court's

16

empirical grounds for narrowing the availability of plea agreements are not factually sound.[9]

It is true that, in rejecting Walker's plea agreement, the district court relied on some generalized analysis, and it invoked broad considerations such as the "cultural context" of Walker's offenses. *See* J.A. 97. If the court's ruling had been premised only on such broad considerations, Walker's challenge would be more substantial. But the court did not rely solely on its discussion of the opioid crisis or its criticism of the plea bargaining system. The court actually centered its analysis on whether the particular plea agreement between Walker and the United States Attorney was too lenient and on whether it served the public interest.

As the record reveals, the district court carefully assessed Walker's extensive criminal history, including the numerous charges and convictions relating to Walker's unrelenting participation in the drug trade. The court emphasized Walker's multiple violent activities, as referenced in the PSR. The court also deemed the advisory Guidelines range under the plea agreement to be overly lenient, in light of Walker's

---

[9] By stating in his brief that the district court's treatment of plea agreements interferes with the prosecutor's "fundamental role" in deciding "which charges to pursue," Walker apparently seeks to invoke a separation of powers claim. *See* Br. of Appellant 25. Walker, however, did not present such a claim to the district court nor does he properly develop that contention on appeal. Consequently, Walker has neither properly preserved nor presented a separation of powers claim. *See, e.g.*, *Hensley on behalf of North Carolina v. Price*, 876 F.3d 573, 581 n.5 (4th Cir. 2017) (emphasizing that undeveloped and unsupported appellate arguments are waived). Notably, the Government likewise did not preserve and does not pursue a separation of powers claim. Instead, the Government maintains on appeal that we should affirm the rejection of the plea agreement because it did not properly account for Walker's criminal history and his relevant offenses.

criminal history, his potential for violence, and the nature of his offenses.  That individualized assessment of Walker's situation thus relied on appropriate considerations that readily align with the factors we have specified.

Our resolution of the plea agreement issue is made easier by the position taken by the Government in this appeal.  The prosecutors do not present a separation of powers argument, that is, they fail to assert that their exercise of prosecutorial discretion in making the plea agreement should carry the day.  In particular, they do not challenge the district court's determination that the plea agreement would have resolved the case in a manner that was overly lenient and not in the public interest.  Indeed, the prosecutors have abandoned the plea agreement made by the United States Attorney, arguing on appeal that the rejection of it was not an abuse of the court's discretion.  In these circumstances, we are satisfied that the court did not err in rejecting Walker's plea agreement.

B.

Walker next contends that the district court erred in rejecting his claim that the Government used a peremptory challenge in a racially discriminatory manner to strike juror No. 22 — the only remaining African-American on the prospective jury panel — in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  In assessing a challenge to a trial court's denial of a *Batson* objection, we review for clear error.  *See United States v. Dinkins*, 691 F.3d 358, 380 (4th Cir. 2012).  A clear error exists when we are left "with the definite and firm conviction that an error was committed by the district court."  *See United States v. Blanding*, 250 F.3d 858, 860 (4th Cir. 2001).

18

Walker argues that the district court failed to engage with his *Batson* objection during the jury selection process, and maintains that he has since then offered an additional comparative juror analysis that supports his claim. On the other hand, the Government asserts that Walker waived his *Batson* challenge by failing to argue to the trial court that its race-neutral explanation for the peremptory strike of juror No. 22 was pretextual. The Government also argues that, in any event, Walker cannot show that its rationale for the challenged strike was pretextual. To resolve this issue, we will not decide whether Walker waived his *Batson* claim because we agree that Walker failed to prove pretext.

The three-step burden-shifting framework that governs a *Batson* claim is well-established. As we explained in *United States v. Dinkins*:

> First, the defendant must make a prima facie showing that the government exercised a peremptory challenge on the basis of race. Second, once the defendant has made such a prima facie showing, the burden shifts to the government to provide a non-discriminatory reason for its use of the peremptory challenge. Third, the defendant next must establish that the government's proffered reasons were pretextual, and that the government engaged in intentional discrimination.

*See* 691 F.3d at 380. In applying the foregoing framework, we can assume that Walker has satisfied the first step — and thus made a prima facie showing of discrimination — because the Government provided the trial court with its contemporaneous rationale for the peremptory strike. *Id.* at 380 n.17. That is, when the Government has articulated its reasons for the challenged strike on the trial record, we can simply proceed to the second step and assess whether those reasons are race-neutral. *Id.*

19

The Government gave three reasons to the trial court for its peremptory strike of juror No. 22. In reviewing the women in the jury venire, the prosecutors weighed whether a prospective juror was married, whether she had children, and how old she was. That is, the prosecutors sought to empanel jurors who were married, who were older, and who had children. On the other hand, juror No. 22 was single, had no children, and, at 38 years old, was "younger than the average." *See* J.A. 157; J.A.S. 653. Those reasons are each "facially race-neutral" and thus satisfy the second *Batson* step. *See Dinkins*, 691 F.3d at 380.

With the Government having satisfied the second step, Walker bore the burden of showing that the prosecutor's rationale for striking juror No. 22 was a pretext for "purposeful discrimination." *Id*. at 381. Evidence of such discrimination can be shown where "the purportedly race-neutral reason offered by the government" for striking an African-American prospective juror "applies equally to other members of the venire who are otherwise similarly-situated, but who are not African-American." *Id*. at 380-81.

In pursuing this challenge, Walker identifies as relevant comparators four white women who served on the jury. Each of those women, however, had children. Moreover, three were older than juror No. 22 (aged 42, 48, and 58). The one woman who was younger (age 33) than juror No. 22 was married and had three children. One of the four women was divorced, but she was ten years older than juror No. 22 and had two children. Because each of Walker's comparators possessed at least two of the three race-neutral characteristics relied on by the prosecutors, we are unable to say that the trial court clearly erred in overruling Walker's *Batson* challenge. *See Dinkins*, 691 F.3d at

20

381 (identifying no clear error in denial of *Batson* claim where two race-neutral factors supported peremptory strike); *see also Golphin v. Branker*, 519 F.3d 168, 186-87 (4th Cir. 2008) (discerning, on habeas review, no error in denial of *Batson* claim where race-neutral factors reasonably distinguished struck jurors from seated jurors).

C.

Walker's third and final appellate contention relates to the district court's calculation of his advisory Guidelines range. We generally review a challenge to the court's imposition of sentence for abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 51 (2007). In evaluating a sentencing court's calculation of the advisory Guidelines range, however, we review "the district court's factual findings for clear error and legal conclusions de novo." *See United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017).

Walker argues on appeal that the court erred in applying the 2-level enhancement for possession of a stolen firearm pursuant to Guidelines § 2K2.1(b)(4)(A). In his view, the court erred in applying that enhancement on the basis of the uncorroborated NCIC report showing that the .38-caliber Rossi handgun was stolen. According to Walker, the NCIC report alone is inadequate evidence to support the stolen firearm enhancement.[10] The Government contends that an NCIC report is sufficient to sustain the enhancement, but emphasizes that it also offered to present evidence corroborating the report. The

---

[10] In his reply brief, Walker contended that the serial number of the stolen .38-caliber Rossi handgun listed in the NCIC report failed to match the serial number of the handgun Walker was convicted of possessing. At oral argument, however, Walker's lawyer conceded that this contention was made in error.

21

Government thus maintains that it satisfied its burden to show that the sentencing enhancement is supported by a preponderance of the evidence. *See United States v. Andrews*, 808 F.3d 964, 968 (4th Cir. 2015) (discussing burden of proof for sentencing enhancement).

We have heretofore described the NCIC as "a computerized index of criminal justice information available to, and updated by, federal, state, and local law enforcement agents," under the overall administration of the FBI. *See United States v. McDowell*, 745 F.3d 115, 118 (4th Cir. 2014). We have also observed that "the limited available evidence suggests that the NCIC database is generally (albeit not always) accurate." *Id*. at 121. As we have recognized, NCIC reports are "pervasive" in the criminal justice system, and they are consistently used by the courts for such purposes as establishing criminal history in sentencing and to inform rulings on bail and pretrial release. *Id*. at 120-22 (citing, inter alia, *United States v. Townley*, 472 F.3d 1267, 1277 (10th Cir. 2007); *United States v. Marin-Cuevas*, 147 F.3d 889, 895 (9th Cir. 1998)).

We adhere to our view that, at least where the defendant has not pointed to any evidence casting doubt on an NCIC report being used to support an enhancement, the report "may be trusted." *See id*. at 121-22. That approach accords with the general rule that a defendant seeking to challenge a finding in his PSR "has an affirmative duty to make a showing that the information in the [PSR] is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *See United States v. Powell*, 650 F.3d 388, 394 (4th Cir. 2011) (internal quotation marks omitted). Absent such a

22

showing, the district court is entitled to adopt the PSR's findings "without more specific inquiry." *Id*.

Here, the second PSR — relying on the NCIC report — specifically concluded that the .38-caliber Rossi in Walker's possession was stolen. *See* J.A.S. 678, 681. On this record, Walker has no evidence to cast doubt on that report or on the findings of the second PSR. He has therefore failed to make a viable challenge to the second PSR's conclusion that the .38-caliber Rossi was stolen. Because Walker had no evidence that cast doubt on the reliability or accuracy of the NCIC report or the second PSR, the district court did not err in applying the stolen firearm enhancement.[11]

### III.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*

---

[11] Even if the district court had erred in applying the stolen firearm enhancement, we would not disturb the sentence because the alleged Guidelines calculation error would be harmless. *See, e.g.*, *United States v. Gomez-Jimenez*, 750 F.3d 370, 385 (4th Cir. 2014). The court explained that it would impose a 120-month sentence regardless of the advisory Guidelines range, and that sentence is substantively reasonable absent the enhancement. As a result, any Guidelines error was harmless. *See United States v. McDonald*, 850 F.3d 640, 643-45 (4th Cir. 2017).

NIEMEYER, Circuit Judge, concurring:

I concur in Judge King's careful opinion and write separately only to address a concern raised by Walker about whether his plea agreement was rejected on broad policy grounds and categorical determinations, rather than on grounds specific to him and the public interest in his particular circumstances. Judge King's opinion well recognizes the legitimacy of Walker's argument in the abstract but concludes that the district court's rejection in this case was based on its belief that Walker's sentence would be too lenient in the circumstances and thus not in the public interest.

The district court's opinion in support of its rejection of Walker's plea agreement is lengthy, and it does indeed contain statements that could reasonably have provoked Walker's concern. If the court's rejection of the plea agreement had rested on the broad proposition that the government uses plea agreements too frequently as a matter of convenience, as some of the court's statements seem to suggest, then its rejection of the plea agreement on that basis would surely amount to an abuse of discretion. Moreover, it would be risking an inappropriate intrusion into the U.S. Attorney's prerogatives — implicating separation-of-powers concerns. As an example of a particular statement of this genre, the court said that "[i]t is the court's function to prevent the transfer of criminal adjudications from the public arena to the prosecutor's office for the purpose of expediency at the price of confidence in and effectiveness of the criminal justice system." And it explained:

> The exigencies of a changing world have required acceptance of processes that are more streamlined than those contemplated by our Founding Fathers. Plea bargaining is one such process that we've come to embrace.

24

> Plea bargaining eliminates the jury and conflates the judge's and prosecutor's roles, creating an administrative system of criminal justice. A species of trial does indeed occur, but it occurs in the shadow of guilty pleas rather than in open court.

The court then wondered whether, in such an arrangement, a "'community catharsis can occur' without the transparency of a public jury trial," apparently critiquing plea agreements as a general matter.

But these passages with their broad scope of musings are interspersed among the district court's more numerous passages expressing concern about Walker's criminal conduct and its relation to the opioid crisis in the West Virginia community. Accordingly, we take the district court's concern about those matters to be the driving reason for its rejection of the plea agreement, as Judge King has explained.

Moreover, in this case, it would be inappropriate, as Judge King notes, for us to protect the prerogatives of the U.S. Attorney when the government has not raised the issue and has explicitly stated, in response to our inquiries, that it is not pressing the issue in this case. Rather, the government contends that Walker received appropriate criminal process and a just result, and with our decision today, we agree.

25