2013 VT 117

## Thomas R. Baptie and Mary L. Baptie, Individually and as Administrators of the Estate of John Baptie v. Jonathan Bruno and Aron McNeil

[88 A.3d 1212]

No. 13-003

Present: Reiber, C.J., Dooley, Burgess and Robinson, JJ., and Bent, Supr. J., Specially Assigned

Opinion Filed December 6, 2013

*Thomas W. Costello* and *George Anthes* of *Costello, Valente & Gentry, P.C.*, Brattleboro, for Plaintiffs-Appellants.

*James F. Carroll* and *Constance Tryon Pell* of *English, Carroll & Boe, P.C.*, Middlebury, for Defendant-Appellee.

¶ 1. **Burgess, J.** Plaintiffs Thomas and Mary Baptie, administrators of the estate of their son, John Baptie, appeal the superior court's decision granting defendant Aron McNeil, a former police officer, summary judgment with respect to their lawsuit alleging that the officer was liable for the death of their son as the result of his negligent investigation of their complaint against defendant Jonathon Bruno, the man who murdered their son four days after they made the complaint. We agree with the superior court's conclusions that defendant is entitled to qualified official immunity from plaintiffs' lawsuit and that, in any event, plaintiffs cannot prove all of the elements of their negligence or intentional infliction of emotional distress (IIED) claims. Accordingly, we

affirm the superior court's grant of summary judgment in defendant's favor.

¶ 2. The record, viewed most favorably to plaintiffs, reveals the following facts. On October 28, 2007, defendant Aron McNeil, a Town of Castleton police officer at the time, responded to Thomas Baptie's 911 call indicating that his family had received threatening telephone calls from a person named Jonathon Bruno, who was angry because plaintiff's son, John Baptie, had not paid Bruno money that Bruno believed was owed him. Thomas reported that Bruno had threatened to come over and shoot him and his family. Defendant went to the Baptie residence in response to the 911 call. Thomas was unhappy that a local police officer, and particularly defendant, responded to his call because of his past run-ins with the Castleton Police Department and defendant, but defendant told him that his only option was working with local police.

¶ 3. After informing defendant of the threats Bruno had made during three telephone calls to the Baptie residence that evening, Thomas played a threatening voicemail message that Bruno had left during the last telephone call. John told defendant that he had known Bruno most of his life and that Bruno had just been released from prison a month or two earlier. John also told defendant that he owed Bruno $30 or $40 for baseball cards and not anything else. Defendant advised Thomas that he would call Bruno and tell him to stop calling the Baptie residence. He asked Thomas to let him know if Bruno continued to call, in which case he would consider it harassment by telephone.

¶ 4. At that point the telephone rang, and Thomas allowed defendant to answer it. Defendant then engaged in a conversation with Bruno, the caller. Defendant told Bruno to stop calling the Baptie residence. He also tried to obtain personal information from Bruno, but Bruno was not responsive to questions concerning his identity or whereabouts. Defendant told Bruno that he knew Bruno was on probation and that if he came to the Baptie residence he would be charged with unlawful trespass. After the call ended, defendant asked Thomas to call him if Bruno telephoned again. Defendant also indicated that he would charge Bruno with harassment by telephone if he called back.

¶ 5. Early the following morning, defendant returned to the Baptie residence after Thomas reported that Bruno had called again and left a threatening voicemail message on Mary Baptie's

cellphone. After Thomas played the message for defendant, defendant informed plaintiff that he had not yet been able to locate Bruno, but was attempting to do so. He also told Thomas that he had just called Bruno "and read him the riot act" but that Bruno was not listening because he knew that defendant did not yet know how to locate him. After defendant informed Thomas that Bruno could be charged at that point only with harassment by telephone, a misdemeanor, the parties discussed Bruno's possible whereabouts, and defendant left the residence stating that he would continue trying to locate Bruno and would get back to plaintiffs.

¶ 6. That afternoon, October 29, 2007, defendant received information from the Vermont Fusion Center regarding his recent criminal records request. The information identified Bruno, listed an address, and indicated a criminal history in both Vermont and Texas. Defendant issued a citation against Bruno for harassment by telephone, a misdemeanor. Based on his mistaken belief that Bruno's last known address was in the City of Rutland, on or about October 30, 2007, defendant contacted the Rutland Police Department for assistance in serving Bruno with the citation. Rutland police were unsuccessful in serving the citation at the address provided by defendant. Plaintiffs did not receive any more telephone calls from Bruno, and defendant did not pursue further service of the citation before Bruno murdered Baptie on November 1, 2007.

¶ 7. The murder occurred when John Baptie and Bruno encountered each other in a parking lot in Rutland. The two argued, with Bruno accusing John of calling the police and John accusing Bruno of making threatening telephone calls to his family. Bruno invited John to go behind a nearby store and settle matters. Unfortunately, John complied, following Bruno behind the store, where Bruno fatally stabbed him in the neck.

¶ 8. In April 2009, plaintiffs filed a wrongful death action against Bruno. Six months later, the superior court granted plaintiffs' motion to add Aron McNeil as a defendant in his individual capacity. Plaintiffs made claims against defendant McNeil premised on negligence and IIED, seeking both compensatory and punitive damages. On August 3, 2012, the superior court granted defendant McNeil's motion for summary judgment, ruling that, as a matter of law: (1) plaintiffs could prove neither duty nor causation with respect to their negligence claim; (2) defendant was

entitled to qualified immunity because the conduct complained of constituted discretionary acts within the scope of defendant's official investigative duties, and plaintiffs could prove neither bad faith nor gross negligence on defendant's part; (3) plaintiffs could not show that defendant's conduct was so outrageous that he could be found liable for IIED; and (4) punitive damages were unavailable because defendant was entitled to summary judgment on all claims of liability.

¶ 9. Plaintiffs obtained a default judgment against Bruno in September 2012. Following a hearing on damages, a final judgment was entered in the case. Plaintiffs then appealed the superior court's summary judgment ruling in favor of defendant McNeil. On appeal, plaintiffs argue that the court erred in ruling that: (1) plaintiffs could not prove the required elements of negligence or IIED; and (2) defendant was otherwise entitled to qualified official immunity.

¶ 10. In reviewing a summary judgment ruling, we consider de novo whether there are disputed issues of material fact and whether the moving party is entitled to judgment as a matter of law. V.R.C.P. 56(a); *Lakeside Equip. Corp. v. Town of Chester*, 173 Vt. 317, 321, 795 A.2d 1174, 1178 (2002). "Summary judgment is mandated under the plain language of V.R.C.P. 56(c) where, after an adequate time for discovery, a party 'fails to make a showing sufficient to establish the existence of an element' essential to his case and on which he has the burden of proof at trial." *Poplaski v. Lamphere*, 152 Vt. 251, 254-55, 565 A.2d 1326, 1329 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In determining whether summary judgment is appropriate, we must consider the record in light most favorable to the nonmoving party. *Chase v. Agency of Human Servs.*, 2011 VT 31, ¶ 14, 189 Vt. 613, 19 A.3d 167 (mem.); see *Collins v. Thomas*, 2007 VT 92, ¶ 6, 182 Vt. 250, 938 A.2d 1208 (stating that all doubts and inferences are construed in favor of party opposing summary judgment). Nevertheless, in opposing summary judgment, the nonmoving party may not "rest on bare allegations to demonstrate that disputed material facts remain." *Johnson v. Harwood*, 2008 VT 4, ¶ 5, 183 Vt. 157, 945 A.2d 875; see *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 55, 644 A.2d 316, 318 (1994) ("Opposing allegations must have sufficient support in specific facts to create a genuine issue of material fact.").

314

¶ 11. ■ We first address the superior court's ruling that defendant is entitled to qualified official immunity under the circumstances of this case.[*] "Qualified immunity attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Murray v. White*, 155 Vt. 621, 627, 587 A.2d 975, 978 (1991). "Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." *Id.* at 630, 587 A.2d at 980; see *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 213, 790 A.2d 408, 419 (2001) ("We use an objective standard when assessing whether a public official's acts were taken in good faith.").

¶ 12. ■ In determining whether a particular government official should be protected by qualified immunity, we are guided by the doctrine's purpose: to protect officials from exposure to personal tort liability that could (1) hamper their ability to effectively discharge their duties and (2) subject their discretionary determinations to review by a judicial system ill-suited to assess the full scope of factors involved in such determinations. *Hudson v. Town of East Montpelier*, 161 Vt. 168, 172, 638 A.2d 561, 564 (1993). Here, the scope of defendant's investigation into plaintiffs' complaint was at the heart of his official and discretionary duties as a police officer. Cf. *Czechorowski v. State*, 2005 VT 40, ¶ 21, 178 Vt. 524, 872 A.2d 883 (mem.) (concluding that investigation of state agency's general counsel into allegations of sexual assault may have been imprudent or even neglectful but that her decision not to investigate further was discretionary rather than ministerial in nature).

¶ 13. ■ We find unavailing plaintiffs' attempts in this case to parse defendant's investigatory actions so as to tie his alleged negligence to a ministerial rather than a discretionary act. Although we determined in *Kennery v. State*, 2011 VT 121, ¶ 36, 191 Vt. 44, 38 A.3d 35, that police officers performing a welfare check were engaging in a ministerial act when they misapplied the information they received to search the wrong house, we explicitly

---

[*] Plaintiffs' "counts" in their complaint alleging breach of ministerial duties and bad faith are actually not independent legal claims, but rather arguments against granting defendant qualified official immunity.

distinguished the situation in *Kane v. Lamothe*, 2007 VT 91, ¶ 10, 182 Vt. 241, 936 A.2d 1303, where an officer used his discretion not to arrest the alleged assailant during his response to, and investigation of, a report of domestic assault. Notwithstanding plaintiffs' argument that defendant violated his ministerial duty to follow police protocol in locating the suspect, his alleged negligent conduct here falls squarely within his discretion to determine the scope of his investigation, including what efforts he undertook to serve a misdemeanor citation on Bruno for making harassing telephone calls in response to plaintiffs' complaint of having received threatening telephone calls.

¶ 14. ■ As for plaintiffs' claim that defendant's actions violated clearly established law, internal policies and manuals not adopted as formalized rules are "not legal requirements for which individuals may hold the State liable," and do not create a duty to third parties. *Kane*, 2007 VT 91, ¶ 11. Nor could an officer in defendant's position reasonably have believed that his actions in investigating plaintiffs' complaint violated Vermont's Good Samaritan Act, 12 V.S.A. § 519(a), or a duty to protect John Baptie. Although Thomas Baptie had reported to defendant that Bruno made threatening remarks about coming to the Baptie residence to harm his family, John Baptie did not appear to be in, or to consider himself to be in, any immediate danger, and defendant never suggested that he was undertaking a duty to protect plaintiffs' son.

¶ 15. Moreover, even considering the facts most favorably to plaintiffs, the record contains no evidence of bad faith on defendant's part. To the contrary, the record reveals that defendant informed plaintiffs that he would attempt to locate Bruno and charge him with the misdemeanor offense of harassment by telephone, and that he followed through on that promise, even if incompletely, by identifying Bruno and attempting to locate him and serve him with a citation. An objective person in defendant's position could not have believed that his conduct violated clearly established law.

¶ 16. Plaintiffs allege animus on defendant's part toward Thomas Baptie, and further allege that when he first arrived at their residence he lied to them about already having tried to identify and locate Bruno through the police computer system. While plaintiffs may have been dubious about defendant's attention to

their complaint on account of his prior dealings with Thomas, no evidence of actual animosity was raised and nothing in the record suggests that defendant's investigation was influenced by his past experiences with Thomas. Plaintiffs allege that defendant was inaccurate or untruthful in a statement to them about his initial attempt to identify the caller; however, the undisputed facts are that defendant did follow up with efforts to identify and locate Bruno and to serve him with a misdemeanor citation, which is all that he had told plaintiffs he would do. In short, because plaintiffs cannot show either that defendant's conduct in responding to their complaint was ministerial rather than discretionary in nature or that defendant acted in bad faith or violated clearly established law, defendant is immune from their lawsuit claiming that his inadequate investigation of their complaint made him liable for their son's murder.

¶ 17. ▮ In any event, we also agree with the superior court that plaintiffs cannot prove all of the elements of their negligence and IIED claims. Regarding the negligence claim, the superior court ruled that plaintiffs would be unable to prove either causation or the related element, duty. We examine the more primary element — duty — first and agree that plaintiffs cannot prove that defendant owed them a duty to prevent the murder of their son.

¶ 18. ▮ The general rule is that "crimes committed by a third party fall within the realm of the unforeseeable, and therefore cannot form the basis for [tort] liability." *Edson v. Barre Supervisory Union #61*, 2007 VT 62, ¶ 13, 182 Vt. 157, 933 A.2d 200. Defendants in civil tort actions may be held responsible for protecting a person against the criminal act of another "only where the defendant had special knowledge or notice upon which to impose a duty to anticipate the wrongful act." *Id.*; compare *Sabia v. State*, 164 Vt. 293, 305-06, 669 A.2d 1187, 1195-96 (1995) (concluding that child protection agency had duty to protect two sisters from known abuser by virtue of its awareness of abuse and its statutory duty to protect abused children) with *Estate of Sumner v. Dep't of Soc. & Rehab. Servs.*, 162 Vt. 628, 629, 649 A.2d 1034, 1036 (1994) (mem.) (concluding that child protection agency had no duty to anticipate sexual assault and murder perpetrated by child under its supervision).

¶ 19. ▮ In determining whether the state or state actors have a special duty subjecting them to liability for harm caused by third parties, we consider:

> (1) whether a statute sets forth mandatory acts for the protection of a particular class of persons; (2) whether the government has knowledge that particular persons within that class are in danger; (3) whether those persons have relied on the government's representations or conduct; and (4) whether the government's failure to use due care would increase the risk of harm beyond what it was at the time the government acted or failed to act.

*Sabia,* 164 Vt. at 299, 669 A.2d at 1191.

¶ 20. Relying on these factors in *Kane,* we concluded that general statutes aimed at preventing crime created "no special relationship between crime victims and law enforcement personnel" that would make a state trooper liable for his allegedly negligent response to, and investigation of, an incident of domestic abuse. 2007 VT 91, ¶ 9. As noted earlier, we also concluded in *Kane* that internal Vermont state police operational policies and procedures contained in a manual that, among other things, provided guidelines for making an inherently discretionary arrest decision did not create a duty owed to the victim to arrest the assailant in that particular case. *Id.* ¶¶ 10-11.

¶ 21. ▮ In this case, plaintiffs cannot prove that defendant had a special relationship or notice upon which to base his liability for Bruno's murder of their son. Notwithstanding Bruno's threats, as far as defendant knew from what the Bapties told him, Bruno and John Baptie had known each other for a long time from school, and Bruno was threatening John solely because John owed him a relatively small amount of money for baseball cards. Certainly, defendant did not have a reason or duty to anticipate John Baptie's decision to engage the man who was the object of plaintiffs' complaint. See *Edson,* 2007 VT 62, ¶ 10 (noting that, under common law, scope of legal duty of ordinary care is determined in part by foreseeability of consequences of individual's acts or omissions).

¶ 22. Defendant initially told plaintiffs that he would investigate their complaint, and then later told them that he would attempt to locate Bruno and charge him with the misdemeanor crime of

harassment by telephone. Defendant neither promised, nor had a duty, to conduct his investigation in a particular manner. As in *Kane*, the police's internal policies on conducting investigations, including policies regarding the entering of names in the Computer Aided Dispatch system, did not create a duty on defendant's part, for the benefit of plaintiffs, to conduct the investigation in a particular manner.

¶ 23. Plaintiffs' theory depends on the assumption that defendant's investigation would result in Bruno's incarceration and thus incapacitation from harming John Baptie. The undisputed facts demonstrate that defendant never assured or even suggested to plaintiffs that he would seek to have Bruno incarcerated in the near future; rather, he told them that he would attempt to locate Bruno and charge him with a misdemeanor. Nothing in the record suggests that plaintiffs expected defendant or anyone else to remove Bruno from the streets in the immediate future. In fact, Thomas Baptie suggested to defendant on several occasions that he would take matters into his own hands if Bruno showed up at his residence. In short, viewing the facts most favorably to plaintiffs, plaintiffs cannot show that defendant owed them a special duty to prevent Bruno's murder of their son.

¶ 24. ■ ■ Plaintiffs fare no better on their IIED claim. The elements of an IIED claim are: "(1) conduct that is extreme and outrageous, (2) conduct that is intentional or reckless, and (3) conduct that causes severe emotional distress." *Thayer v. Herdt*, 155 Vt. 448, 455, 586 A.2d 1122, 1126 (1990). "An IIED claim can be sustained only where the plaintiff demonstrates 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 10, 184 Vt. 1, 955 A.2d 1082 (quoting *Boulton v. CLD Consulting Eng'rs, Inc.*, 175 Vt. 413, 427, 834 A.2d 37, 49 (2003)). Putting aside plaintiffs' difficulty in proving causation for the emotional distress they undoubtedly suffered upon the death of their son, plaintiffs cannot, as a matter of law, demonstrate that defendant's conduct was either outrageous or in reckless disregard of the probability of it resulting in extreme emotional distress.

¶ 25. ■ It is undisputed that defendant responded to plaintiffs' complaint; that he made efforts both at the Baptie residence

in talking to Bruno, and later, to locate Bruno; that he called Bruno on the telephone number he obtained at the Baptie residence in a further effort to identify and locate him; that he in fact eventually identified Bruno and thought he had discovered Bruno's then-current address; and that he asked the Rutland police to serve a citation upon Bruno, although they were ultimately unable to do so. In short, the record demonstrates that, even if defendant's investigation proved to be inadequate or incomplete, he made some effort to locate and charge Bruno for what he reasonably believed to be a misdemeanor crime. This conduct cannot be considered outrageous in the extreme, and the superior court correctly granted defendant summary judgment on this claim. See *Jobin v. McQuillen*, 158 Vt. 322, 327, 609 A.2d 990, 993 (1992) (noting that trial court in first instance determines as threshold question whether jury could determine that conduct at issue is so outrageous and extreme as to go beyond all possible bounds of decency).

¶ 26. Finally, plaintiffs cannot prevail on their claim for punitive damages since they are not entitled to an award of compensatory damages. See *Pion v. Bean*, 2003 VT 79, ¶ 44, 176 Vt. 1, 833 A.2d 1248 (stating that "court can award punitive damages only if it has awarded compensatory damages"). For all of the above reasons, we affirm the superior court's grant of summary judgment to defendant.

*Affirmed.*