Filed 12/15/25

VERMONT SUPERIOR COURT
Chittenden Unit
175 Main Street
Burlington VT 05401
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 25-CV-01196

## John Doe v. Todd Deluca et al

# ENTRY REGARDING MOTIONS

Title:     Motion to Dismiss; Motion to Dismiss; Motion to Accept Late Filing; Motion for Leave to File Sur-reply; Motion for Leave to File Supplemental Memo of Law (Motion: 9; 12; 14; 15; 16)

Filer:     John Doe; Joshua R. Diamond; Todd Deluca

Filed Dates:     May 16, 2025; June 16, 2025; August 11, 2025; September 10, 2025; October 13, 2025

Plaintiff John Doe brought this action against Defendants Todd DeLuca and YouTube, LLC after DeLuca posted on YouTube a video he recorded of Doe. Doe's Amended Complaint asserts claims against DeLuca for intentional infliction of emotional distress ("IIED"), invasion of privacy and "unlawful commercial exploitation" and against YouTube for "contributory infringement/liability," breach of contract and violation of the right of publicity. DeLuca and YouTube have each moved to dismiss the respective claims against them. Doe has opposed both.

For the reasons that follow, the court (a) GRANTS DeLuca's motion to dismiss (Mot. #9); (b) GRANTS YouTube's motion to dismiss (Mot. #12); and (c) GRANTS Doe's Motion to Accept Late Filing (Mot. #14), Motion for Leave to File Sur-reply (Mot. #15) and Motion for Leave to File Supplemental Memo of Law (Mot. #16).

## A. Background

On March 18, 2025, DeLuca recorded a 29-minute video that included Doe and others standing in public view outside a homeless shelter and warming center on Pearl Street in Burlington. An approximately two-minute portion of that video captures Doe speaking and apparently recording or attempting to record DeLuca on Doe's cell phone. The video shows other people closer to Doe than DeLuca who remains on or near the public sidewalk. Doe speaks to DeLuca who does not respond. DeLuca turned Doe's speaking portion of the video into a YouTube "short" video. DeLuca posted both videos to his YouTube channel, for commercial profit according to Doe. Doe never gave DeLuca consent to record him or use his image. Sometime after Doe filed this lawsuit, both DeLuca and YouTube removed the videos.

**B. Discussion**

1. Motion to Dismiss Standard

Under V.R.Civ.P. 12(b)(6), the court "must assume that the facts pleaded in the complaint are true and make all reasonable inferences in the plaintiff's favor." *Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 10, 209 Vt. 514. The court does not accept as true "conclusory allegations or legal conclusions masquerading as factual conclusions." *Vitale v. Bellows Falls Union High Sch.*, 2023 VT 15, ¶ 28, 217 Vt. 611 (quotation omitted). The court considers whether "it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." *Davis v. American Legion, Dept. of Vermont*, 2014 VT 134, ¶ 12, 198 Vt. 204 (quotation omitted). "The purpose of a motion to dismiss is to test the law of the claim, not the facts which support it." *Powers v. Off. of Child Support*, 173 Vt. 390, 395 (2002). As a result, only "where the plaintiff does not allege a legally cognizable claim, [is] dismissal . . . appropriate." *Montague*, 2019 VT 16, ¶ 11.

"The court's attention . . . is to be directed toward determining whether the bare allegations of the complaint constitute a statement of a claim under V.R.C.P. 8(a)." *Levinsky v. Diamond*, 140 Vt. 595, 600 (1982). Rule 8 requires a "short and plain statement of the claim" in "simple, concise, and direct" language with "all pleadings [to] be construed as to do substantial justice." V.R.Civ.P. 8(a), (e), (f). "[T]he threshold a plaintiff must cross in order to meet our notice-pleading standard is exceedingly low." *Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575 (citation omitted). Consequently, "[m]otions to dismiss for failure to state a claim are disfavored and should be rarely granted." *Id.* (citation omitted). The court should be "particularly wary of dismissing novel claims because '[t]he legal theory of a case should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations.'" *Montague*, 2019 VT 16, ¶ 11 (citation omitted). The Court does not need to make any findings now. *See id.* ¶ 10.

2. What the Court May Consider in a Motion to Dismiss

At the outset, this court notes that it included the challenged videos and YouTube's Terms of Service ("ToS") in drafting the Background section above and will assess both items in the Discussion section below. This court has not found any Vermont Supreme Court decision that discusses in detail when a court may consider materials beyond the pleadings on a Rule 12(b)(6) motion without converting it into a Rule 56 motion that would require notice to the parties. *See* V.R.Civ.P. 12(b); *Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 10 n.4, 186 Vt. 605 (sanctioning with limited discussion trial court's consideration of document referenced but not attached to complaint). Leading commentary and significant case law under the federal counterpart to Rule 12(b) supports doing so in this case where Doe's complaint relies heavily on both the video and the ToS, the materials prove central to his case and no party questions their accuracy or authenticity. *See* Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed. 2004 and Supp. 2007).

According to the Supreme Court, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,

in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)). The Second Circuit and its district courts have followed *Tellabs*. *E.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (*quoting Tellabs*). *See also White v. Core Civic Corp.*, Civil Action No. 2:20-CV-211-CR-KJD, 2022 WL 1250779, at *2 n.5 (D. Vt. Feb. 24, 2022) (considering on motion to dismiss exhibits attached to motion for injunctive relief but not attached to complaint apparently inadvertently); *Warchol v. Green Mt. Coffee Roasters, Inc.*, No. 2:10-cv-227, 2012 WL 236099, at *1 (D. Vt. Jan. 27, 2012) (citing *Tellabs* to allow it to consider on motion to dismiss "public disclosure documents filed with the SEC as required by law," as well as documents "possessed by or known to the plaintiff and upon which it relied in bringing the suit") (other citations omitted). In the Second Circuit's words, "[c]onsideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion," but "several conditions must be met." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). "[I]t must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (citations omitted). In addition, while courts may consider materials "integral" to a complaint when addressing motions to dismiss, doing so requires that "'plaintiff[] rel[y] on the terms and effect of [the] document in drafting the complaint.'" *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (emphasis in original).

Other circuits follow similar rules. The Seventh Circuit has held that "documents may be considered by a district court in ruling on the motion to dismiss without converting the motion into a motion for summary judgment" because "'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.'" *Burke v. N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013) (citation and brackets omitted). Moreover, "[t]he court 'is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material.'" *Id.* (citing 5 Wright & Miller, Federal Practice & Procedure: Civil 2d, § 1327 at 766 (1990)) (other citations omitted). *Burke* consequently ratified a district court's consideration of a "clearly central" report repeatedly referenced by but not attached to plaintiff's complaint. *Id.*

In the Eighth Circuit, "[t]hough 'matters outside the pleadings' may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Services*, 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted). "In general, materials embraced by the complaint include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Id.* (citation omitted). In deciding a motion to dismiss, a court may "consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." *Id.* (quoting 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)) (other citations omitted). "In a case involving a contract, the court may examine the contract documents in deciding a motion to

dismiss." *Id.* (citation omitted). Importantly, "[t]his is true even if contract documents not attached to the complaint refute a breach-of-contract claim . . . ." *Id.* (citations omitted). Accordingly, *Zean* approved a district court's consideration in a motion to dismiss of the contract that formed the subject of plaintiff's breach of contract claim, even though plaintiff had not attached it and the contract language undermined plaintiff's claim of breach. *Id.* at 527.

Any of the Second, Seventh or Eighth Circuits' approaches supports examining the content of the videos and ToS in deciding the pending Rule 12(b)(6) motions in this case. Doe's complaint references the video 15 times (Am. Compl. at 1-3, 5-6). The video forms the crux of five of his six claims and a critical part of his sixth claim. His fifth claim relies on YouTube's ToS which his complaint mentions six times (*id.* at 3, 5). At the preliminary injunction hearing, Doe described the video (Apr. 22, 2025 tr., at 12) and did not object to DeLuca's offering it into evidence (*id.* at 24). Doe also described the short video at the hearing (*id.* at 34). YouTube attached its ToS to its motion and, instead of objecting to its attachment, Doe referenced it nine times in his opposition (Doe's Opp. at 7-9, 11). In the words of the circuit courts, Doe's complaint and case have "embraced" the videos and ToS, "whose authenticity" and "accuracy" "no party questions"; they are "clearly central" to his complaint and case; and "no material disputed issues of fact regarding the relevance" of the videos and ToS exist. Considering the videos and ToS also aligns not only with the rules established by the Second, Seventh and Eighth Circuits, but also with V.R.Civ.P 10(c) which provides in part that "any written instrument which is an exhibit to a pleading is a part thereof for all purposes." *Id.* As a result, this court finds consideration of the videos and ToS in connection with the pending motions to dismiss makes sense and prejudices no one.

### 3. Assessing Doe's Claims

#### a. IIED by DeLuca

Doe has alleged that (1) DeLuca's "act of recording a vulnerable, homeless individual and exploiting their image for profit, without consent, can be considered outrageous and intolerable," (Am. Compl. at 3), and (2) DeLuca's "actions have caused the plaintiff, Jonn Doe, severe emotional distress, including anxiety and PTSD." (*Id.*). DeLuca responds that "[n]o outrageous or extreme conduct occurred." (DeLuca's Mot. at 2.) Both parties have provided the court with largely conclusory statements in this respect. Neither party has cited to case law supporting the proposition that recording the image of another without their permission does or does not constitute an intentional infliction of emotional distress as a matter of law.

"Vermont recognizes the tort of intentional infliction of emotional distress. To prevail, plaintiff must demonstrate 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296 (1990) (citation omitted). "To satisfy the IIED standard, "[p]laintiff[] bear[s] 'a heavy burden that requires . . . show[ing] that the [defendant's] conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable.'" *Marshall v. Nat'l Bank of Middlebury*, No. 5:19-CV-246, 2021 WL 6803284, at

4

*11 (D. Vt. Dec. 3, 2021) (quoting *Cate v. City of Burlington*, 2013 VT 64, ¶ 28, 194 Vt. 265). "The plaintiff must demonstrate 'legal harm resulting from inflicted distress so severe that no reasonable person could be expected to endure it.'" *Id.* (quoting *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 57 (1994)). Under this explicitly objective standard, "[w]hether the alleged conduct was so extreme that a trier of fact could find liability is a threshold question of law." *Carroll v. Tropical Aquaculture Prods., Inc.*, No. 1:08-CV-138, 2009 WL 385430, at *5 (D. Vt. Feb. 13, 2009) (citing *Denton v. Chittenden Bank,* 163 Vt. 62, 66 (1994)).

"Liability for IIED cannot be grounded in 'mere insults, indignities, threats annoyances, petty oppressions, or other trivialities.'" *Id*. (citation omitted). *See also id*. (noting that prima facie case requires proving "1) extreme and outrageous conduct; 2) done intentionally or with reckless disregard of the probability of causing emotional distress; 3) resulting in the suffering of extreme emotional distress; and 4) the extreme emotional distress must be actually or proximately caused by the outrageous conduct.") (citation omitted).

Although this court has not found a Vermont Supreme Court decision addressing what sort of conduct could support an IIED claim in a context similar to this case, the Court has done so in other situations. Those cases highlight the inadequacy of Doe's claim here. For instance, in *Baptie v. Bruno*, 2013 VT 117, parents claimed IIED against a police officer for failing to properly investigate a harassment complaint against a man who days later murdered their son. *Id.* ¶ 1. In denying parents' IIED claim, the Court found that "the record demonstrates that, even if defendant's investigation proved to be inadequate or incomplete, he made some effort to locate and charge [the killer] for what he reasonably believed to be a misdemeanor crime." *Id.* ¶ 25. As a result, "[t]his conduct cannot be considered outrageous in the extreme . . . ." *Id. See also Dalmer v. State*, 174 Vt. 157, 171-72 (2002) (holding that a "statutory violation . . . alone" "does not . . . make defendants' conduct outrageous").

The District of Vermont has reached similar outcomes in comparable cases. In *Grega v. Pettengill*, 123 F. Supp.3d 517 (D. Vt. 2015) (Crawford, J.), plaintiff brought an IIED claim on various theories against state officials for their allegedly deficient investigation of his wife's death. *Id.* at 531. The court applied Vermont law and dismissed the IIED claims based on the state officials' failure to investigate, but it denied dismissal for IIED claims based on fabricated evidence because it found this latter allegation sufficiently outrageous as a matter of law. *Id.* at 550-51 (citations omitted). The District of Vermont reached the same outcome in a different case involving allegations of a deficient law enforcement investigation. *Kucera v. Tkac*, No. 5:12–cv–264, 2014 WL 6463292, at *20 (D. Vt. Nov. 17, 2014) (Reiss, J.).

The Vermont Supreme Court has addressed IIED claims of allegedly outrageous conduct most expansively in the employment context. Employment termination alone will not suffice, but "if the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-a-vis plaintiff, it may provide grounds for the tort action." *Id.* (citation omitted). As a result, prolonged interrogation of an employee "without a break for rest or food," followed by "repeatedly badger[]ing] him to amend and sign a statement," making him "not feel free to leave," ending in employer's "representative direct[ing] plaintiff to clean out his desk" and "a summary dismissal after eighteen years of service" sufficed for an IIED claim to make it to the jury. *Id.* at 448-49.

By contrast, "[t]he demotion of an employee under suspicious circumstances for reasons that do not stand up under scrutiny does not support a claim for intentional infliction of emotional distress." *Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 31. Likewise, "[p]rofane language" with "verbal[] attack[s]" allegedly with "malice" and "manifest[ing] ill will and oppression" are not enough to support an IIED claim. *Carroll*, 2009 WL 385430, at *6. "Absent at least one incident of behavior that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace, incidents that are in themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct was outrageous." *Denton*, 163 Vt. at 67 (citation omitted). *See also Dulude v. Fletcher Allen HealthCare, Inc.*, 174 Vt. 74, 83-84 (2002) (affirming summary judgment of IIED claim where employee's allegations included discharge by a supervisor with a known chemical dependency and other infirmities in the investigation resulting in her termination). *Cf. Sinha v. Kina*, No. 2006-022, 2006 WL 5838954, at *3 (Vt. Oct. 1, 2006) (affirming the trial court's judgment for a landlord against whom plaintiffs had alleged an IIED claim, concluding that landlord's "[e]ntering tenants' driveway, driving past the property, or parking nearby, even if done several times, is not a significantly outrageous act").

Applying those principles to this case, Doe's IIED claim fails as a matter of law. The videos show DeLuca recording a group of people in public view, including Doe. DeLuca speaks in a conversational tone at the intended audience of his videos, not to Doe or the people around him. Doe speaks to DeLuca and appears to record DeLuca on Doe's phone. Throughout the exchange, DeLuca remains on or near the public sidewalk and several other people appear physically closer to Doe than DeLuca, contextualizing that DeLuca maintained socially appropriate physical distance from Doe during the recording.

This court holds that a now commonplace occurrence like DeLuca's recording by cell phone of Doe in public and posting it online without more does not constitute as matter of law the sort of objectively outrageous conduct required for an IIED claim. Inasmuch as Doe may assert particular vulnerabilities to DeLuca's conduct, Doe does not suggest or offer evidence to show that DeLuca had any knowledge of Doe's alleged sensitivities. *See* Restatement (Second) of Torts § 46 cmt. f. (1965) ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."). Even if he had, the absence of objectively outrageous conduct from Doe's allegations would still foreclose this theory of recovery. *Id.* ("It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."). The court grants DeLuca's motion to dismiss Doe's IIED claim.

### b. *Invasion of Privacy by DeLuca*

"One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652C. *See also Staruski v. Cont'l Tel. Co. of Vt.*, 154 Vt. 568, 572–73 (1990) ("[W]e now hold that a damage remedy for invasion of privacy by the appropriation of a person's identity, at least

when done for commercial purposes, should be available in appropriate circumstances in Vermont as in other states."). Yet "[n]o one has the right to object merely because his . . . appearance is brought before the public, since . . . [it is not] in any way a private matter and . . . [is] open to public observation." Restatement (Second) of Torts § 652C, cmt. d. Similarly, "[t]he incidental use of a person's name is not . . . grounds for liability. It is only when [the defendant] makes use of the name to pirate the plaintiff's identity for some advantage of his own . . . that he becomes liable." *Staruski*, 154 Vt. at 571 (quotation omitted). Likewise:

> [N]or is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. . . . The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness. Thus a newspaper, although it is not a philanthropic institution, does not become liable under the rule stated in this Section to every person whose name or likeness it publishes.

Restatement (Second) of Torts § 652C, cmt. d. The Vermont Supreme Court elaborated: "There are of course incidental uses of people's likenesses in commercial advertising, such as a photograph of a busy street where certain pedestrians may be recognizable, and in such a case there could be no liability." *Staruski*, 154 Vt. at 575. *See also Bankers Tr. Co. v. Publicker Indus., Inc.*, 641 F.2d 1361, 1364 (2d Cir. 1981) ("The New York state courts, however, have created an exception to this tort of invasion of the right of publicity for "'incidental use.'"). The *Staruski* court found liability because defendant "featured" plaintiff "exclusively and attributed the company's advertising copy to her solely because of who she was," providing defendant a "commercial benefit . . . from the association of the ad's texts with the names and photographs of select employees." *Id.* at 575. In other words, "There [wa]s nothing incidental about plaintiff's appearance in the ad." *Id.*

By contrast, Doe's claim for invasion of privacy by DeLuca does not meet these requirements to establish liability. DeLuca's 29-minute video captured Doe for about two minutes—the length of the "short" video. In both, however, Doe appears as one of several incidentally recorded people in public view. The videos do not intentionally "feature" Doe or anyone recorded like the plaintiff in *Staruski*. Instead, Doe and the others appear in DeLuca's videos "of a busy street where certain [people] may be recognizable, and in such a case there c[an] be no liability." *Staruski*, 154 Vt. at 575. If anything, Doe's own actions (not DeLuca's) in speaking to DeLuca make Doe a more prominent but still incidental figure compared to the others. That DeLuca operates a YouTube channel on which he posted Doe's incidental likeness does not mean that he "become[s] liable under the rule stated in this Section to every person whose name or likeness [he] publishes." Restatement (Second) of Torts § 652C, cmt. d. The court grants DeLuca's motion to dismiss Doe's claim for invasion of privacy since it does not suffice as a matter of law.

### c. *"Unlawful Commercial Exploitation" by Deluca*

Doe calls his third claim "unlawful commercial exploitation," asserting DeLuca "gained commercially through the plaintiff's image without authorization." (Am. Compl. at 5.) To avoid treating it as a duplication of his invasion-of-privacy claim, the court gives Doe the benefit of the doubt, *see Dodge*, 2014 WL 4825632, at *6, and instead treats this claim as one for right of publicity. *See Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953) ("We think that, in addition to and independent of that right of privacy . . . a [hu]man has a right in the publicity value of [their] photograph, i.e., the right to grant the exclusive privilege of publishing [their] picture, and that such a grant may validly be made 'in gross,' i.e., without an accompanying transfer of a business or of anything else."); Restatement (Third) of Unfair Competition § 46 (1995) ("One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability.").

The Vermont Supreme Court has differentiated this cause of action from a right to privacy: "some authorities hold that the appropriation for profit of a famous person's name or likeness is not an invasion of privacy but a different tort altogether." *Staruski*, 154 Vt. 568, 573 n.5 (citing *Haelan*, 202 F.2d at 868). *Staruski* referenced the West Virginia Supreme Court of Appeals' decision in *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 85 n.6 (W. Va. 1983), that clarified "the 'right of publicity' first recognized in *Haelan* . . . , which remedies the unjust enrichment caused by an unauthorized exploitation of the good will and reputation that a public figure develops in his name or likeness through the investment of time, money and effort." *Id.* In other words, "[t]he right of privacy protects individual personality and feelings, the right of publicity protects the commercial value of a name or likeness." *Id.* Critically, the latter cause of action requires plaintiff to be a public figure or have invested time, money and effort in their likeness. *Id. See also Lerman v. Flynn Distributing Co., Inc.*, 745 F.3d 123, 134 (2d Cir. 1984) (stating that "[b]ecause the plaintiff must generally have developed a property interest with financial value in order to prove that he suffered damages, the right is most frequently invoked by public figures or celebrities" and denying claim of "admittedly private person" who had "never exploited the value of" the likeness challenged in the case).

Doe's allegations do not adequately plead a claim for right of publicity. Doe has alleged: (1) "The defendant gained commercially through the plaintiff's image without authorization." (Am. Compl. at 4); and (2) "The defendant's actions have caused the plaintiff, John Doe, severe emotional distress, including anxiety and PTSD." (*Id.* at 2.) Doe has not alleged that he is a public figure or that he has invested time, money and effort in his likeness. Without these essential elements, his claim cannot survive Rule 12(b)(6) as a matter of law.

### d. *Doe's Claims Against YouTube*

Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1) ("Section 230"), states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id*. In other words, an online platform generally has no liability for content that a third party posts on that platform. *See Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 28 (2d Cir. 2015) ("In short, a

plaintiff defamed on the internet can sue the original speaker, but typically cannot sue the messenger.") (quotation omitted). *See also Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp.2d 690, 699-702 (S.D.N.Y. 2009) (discussing Section 230 congressional intent and outlining cases applying its broad immunity). Section 230 also clarifies that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 42 U.S.C. § 230(e). "[T]he Circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity." *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019) (collecting cases). "Although [p]reemption under the Communications Decency Act is an affirmative defense, . . . it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint." *Ricci*, 781 F.3d at 28 (citation omitted) (alteration in original).

"In applying the statute, courts have broken [it] down into three component parts, finding that [i]t shields conduct if the defendant (1) is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat [the defendant] as the publisher or speaker of that information." *United States v. EZ Lynk, SEZC*, 149 F.4th 190, 195 (2d Cir. 2025) (quotations omitted) (alterations in original). An "interactive computer service" means "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer service, including specifically a service or system that provides access to the Internet." 47 U.S.C. §230(f)(2). "A website that is a passive host of third party content qualifies as an interactive computer service entitled to immunity for the content of that third party." *Ratermann v. Pierre Fabre USA, Inc.*, 651 F. Supp. 3d 657, 666 (S.D.N.Y. 2023) (citations omitted). An "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

An "interactive computer service" defendant "will not be considered to have developed third-party content unless the defendant directly and materially contributed to what made the content itself unlawful." *Force*, 934 F.3d at 68 (quotations omitted). This "'material contribution' test . . . 'draw[s] the line at the crucial distinction between, on the one hand, taking actions . . . to . . . display . . . actionable content and, on the other hand, responsibility for what makes the displayed content [itself] illegal or actionable.'" *Id*. (quoting *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 n.4 (9th Cir. 2016)).

i.    Violation of "Right of Publicity" by YouTube

Section 230 immunity shields YouTube from this claim. Doe alleges (1) "YouTube LLC is contributorily liable for the unauthorized commercial use of Plaintiff's likeness by providing the platform and failing to remove the infringing content after notice"; and (2) "YouTube LLC facilitated the commercial use of Plaintiff's likeness without Plaintiff's consent, violating Plaintiff's right to control the commercial exploitation of their identity." (Am. Compl. at 5.) These allegations treat YouTube wholly as a "publisher" or "speaker" of the videos made and posted by DeLuca. Doe effectively concedes YouTube's status as an "interactive computer service," (Doe's Opp. at 2), and his allegations do not in any way challenge DeLuca's status as "another information content provider." Doe has not alleged that YouTube was "responsible, in

whole or in part, for the creation or development of" DeLuca's video.  47 U.S.C. § 230(f)(3).
*See also Ricci*, 781 F.3d at 28 (upholding 12(b)(6) dismissal where plaintiffs "allege only that GoDaddy 'refused to remove' from its web servers an allegedly defamatory newsletter that was authored by another" since "[t]hese allegations do not withstand the Communications Decency Act, which shields GoDaddy from publisher liability (with respect to web content provided by others) in its capacity as a provider of an interactive computer service").  Doe's allegations fall squarely within Section 230's protections for YouTube.

YouTube's insertion of advertisements into DeLuca's video does not remove Section 230 immunity for YouTube.  (*Cf.* Doe's Opp. at 2 (asserting otherwise).)  A defendant must do more to meet the "material contribution" test.  In *EZ Lynk, SEZC*, 149 F.4th at 200-01, the Second Circuit summarized the sort of activities that can meet the "material contribution" test to include: using "paid researchers to uncover confidential phone records protected by law, and then provid[ing] that information to paying customers" of defendant; "participat[ing] in the development of . . . deceptive content posted on fake news pages" by recruiting, paying and advising affiliates about the content posted by defendant; and working with and otherwise collaborating with defendant system about content complained of by plaintiff.  *Id.  See also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008) (providing illustrations of what constitutes actionable "development").  To defeat 12(b)(6) dismissal, plaintiff's allegations must "raise the reasonable inference" that defendants "courted – *i.e.*, recruited . . . and collaborated with" content providers "to ensure that their [content] would be compatible with and available to users of [defendant] system" – so much so that defendants "specifically encourage[d] development of what [was] offensive about the content." *EZ Lynk, SEZC*, 149 F.4th at 201 (citations omitted).  *See also Force*, 934 F.3d at 66 (holding that Facebook's use of algorithms did not defeat its "publisher" status giving it Section 230 immunity since "arranging and distributing third-party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media" which "is an essential result of publishing").  Doe does not allege YouTube did any of these sorts of activities in this case.

This court found only one case involving claims resembling Doe's, but its different facts support its different outcome.  Plaintiff in that case:

> allege[d] not simply that defendant provided "neutral tools" which may have been used by other parties for "unlawful purposes," but that [defendant] Meta ha[d] "active involvement" in deciding what ads look like and who they are shown to and that its automated tools "supercharge Meta's ability to produce and drive the Scam Ads to vulnerable viewers," which has "been a substantial factor in the continuing production, dissemination, and success" of the challenged ads.

*Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 818 (N.D. Cal. 2024).  The court denied Rule 12(b)(6) dismissal because "[t]hese allegations present[ed] a factual dispute regarding whether Meta's ad systems were neutral tools that anyone could use (or misuse) or whether the tools themselves contributed to the content of the ads, including to the aspects of the content that are allegedly illegal." *Id.*

Doe's allegation that "insertion of advertisements into the video featuring the plaintiff, and its subsequent monetization of that content," (Opp. at 2.), does not meet what *Forrest* requires. Doe has not alleged that YouTube "directly and 'materially' contributed to what made the content itself unlawful." *Force*, 934 F.3d at 68 (quotations omitted). Providing "neutral tools" for DeLuca to post his video does not eliminate Section 230 immunity for YouTube, where it otherwise "did absolutely nothing to encourage the posting of . . . [allegedly actionable] content." *Roommates.Com, LLC*, 521 F.3d at 1171. "[S]o long as [DeLuca] willingly provide[d] the essential published content, [YouTube] receives full immunity regardless of the specific edit[orial] or selection process." *Force*, 934 F.3d 53 at 67.

### ii. "Contributory Infringement/Liability" Against YouTube

Section 230's intellectual property exception also does not save this claim of Doe's that emanates from his right to privacy, as discussed above. Privacy claims do not constitute intellectual property claims excepted from Section 230 immunity. *Ratermann v. Pierre Fabre USA, Inc.*, 651 F. Supp.3d 657, 669 (S.D.N.Y. 2023). Even if they did, the intellectual property exception preserves claims based only on "federal intellectual property" law which Doe does not assert in this case. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 (9th Cir. 2007). Section 230 immunity remains for claims based on state intellectual property law. *See id.* at 1118 ("[P]ermitting the reach of any particular state's definition of intellectual property to dictate the contours of this federal immunity would be contrary to Congress's expressed goal of insulating the development of the Internet from the various state-law regimes."); 42 U.S.C. § 230(e). *Cf. Hepp v. Facebook*, 14 F.4th 204, 212-14 (3d Cir. 2021) (allowing a Pennsylvania "intellectual property" claim to avoid Section 230 immunity while emphasizing "we express no opinion as to whether other states' rights of publicity qualify as intellectual property as a matter of federal law"). Section 230 consequently immunizes YouTube from this claim.

### iii. Breach of Contract by YouTube

Whether Section 230 also precludes Doe's breach-of-contract claim against YouTube based on its terms of service presents another question that Vermont courts have not apparently addressed, at least as far as this court can tell. Federal courts in the Second Circuit have done so very limitedly. *E.g.*, *Domen v. Vimeo, Inc.*, 6 F.4th 245, 253 (2d Cir. 2021) ("Certain claims sounding in contract or tort may be beyond the reach of Section 230(c)(2)'s protection from suit."), *opinion withdrawn*, No. 20-616-CV, 2021 WL 4399692 (2d Cir. Sept. 23, 2021); *Wiener v. Miller*, Case No. 2023 WL 6385816, at *4 (E.D.N.Y. Sep. 29, 2023) (dismissing breach of contract and implied warranty claim because of Section 230 immunity where plaintiff sought to hold defendant liable for published content versus violating terms of service).

The most developed case law on this question, as far as this court can tell, comes from the Ninth Circuit, venue to many of the companies claiming Section 230 immunity. Those cases make clear that, as a matter of law, a breach-of-contract claim can avoid Section 230 immunity even where a tort claim based on similar conduct would fail. "[T]he difference between contract claims and a tort such as defamation is that the latter 'derive[s] liability from behavior that is identical to publishing or speaking . . . .'" covered by Section 230 immunity, whereas

11

"'[p]romising,' on the other hand, 'is different because it is not synonymous with the performance of the action promised.'" *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 743 (9th Cir. 2024) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009)). In other words, "because '[c]ontract law treats the outwardly manifested intention to create an expectation on the part of another as a legally significant event,'" it becomes "a legal duty distinct from the conduct at hand." *Id.* (citation omitted). The Ninth Circuit distilled the rule from its decisions:

> Our cases instead require us to look to the legal "duty." "Duty" is "that which one is bound to do, and for which somebody else has a corresponding right." *Duty*, BLACK'S LAW DICTIONARY (11th ed. 2019). We must therefore examine two things in looking at duty. First, what is the "right" from which the duty springs? If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then § 230(c)(1) does not apply. Second, we ask what is this duty requiring the defendant to do? If it obliges the defendant to "monitor third-party content"—or else face liability—then that too is barred by § 230(c)(1).

*Id.* at 742 (citations omitted). *Calise* and *Barnes*, given their specific facts, excepted plaintiffs' contract claims from Section 230 immunity, even though they dismissed similar tort claims. *See also Estate of Bride v. Yolo Technologies, Inc.*, 112 F.4th 1168, 1177-82 (9th Cir. 2024) (applying *Calise* to bar product liability claim under Section 230 immunity but not misrepresentation claims based on defendant's failure to "unmask and ban users who violated the terms of service" despite informing users that it would); *In re: Apple, Inc. App Store Simulated Casino-Style Games Litigation*, Case No. 5:21-md-02985 *et al.*, 2025 WL 2782591, at *5-*8 (N.D. Cal. Sep. 30, 2025) (holding that Section 230 does not immunize defendant's payment-processing activities unrelated to its publisher activities and mandates no monitoring requirement where defendants could stop offering payment processing instead).

State and federal courts in the Ninth Circuit have applied *Barnes* and *Calise* to find Section 230 immunity against claims similar to Doe's. For instance, in *King v. Facebook, Inc.*, 572 F. Supp.3d 776 (N.D. Cal. 2021), the court found Section 230 immunity for a contract claim in a case brought by a mother and son against Facebook. Their breach of contract claims had several theories, including that Facebook breached its terms of service when it exercised its discretion to disable the mother's account. *Id.* at 795. "In other words, all that Facebook did here was to incorporate into the contract (the Terms of Service) its right to act as a publisher." *Id.* Mindful of *Barnes*'s exhortation that "'what matters is not the name of the cause of action [but rather] whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of content provided by another,'" *id.* at 794 (quoting *Barnes*, 570 F.3d at 1101–02) (other citation omitted) (emphasis omitted) (alteration in original), the *King* court concluded, "[t]his by itself is not enough to take Facebook outside of the protection the CDA gives to 'paradigmatic editorial decisions not to publish particular content.'" *Id.* at 795 (citation omitted). This outcome aligns with *Calise*'s plain language – "If it obliges the defendant to monitor third-party content—or else face liability—then that too is barred by § 230(c)(1)." *Calise*, 103 F.4th at 742 (citation omitted). In that sense, *King* applied the plain language of *Calise*'s second requirement.

In reaching its decision, the *King* court also cited the California appellate court's decision in *Murphy v. Twitter, Inc.*, 274 Cal.Rptr.3d 360 (2021). *Murphy* involved several claims, including one for breach of contract brought by a Twitter user, accusing Twitter "of unfairly applying its general rules regarding what content it will publish and seeks injunctive relief to demand that Twitter restore her account and refrain from enforcing its Hateful Conduct Policy." *Id.* at 372. The *Murphy* court noted that other "[c]ourts have routinely rejected a wide variety of civil claims like Murphy's that seek to hold interactive computer services liable for removing or blocking content or suspending or deleting accounts (or failing to do so) on the grounds they are barred by the CDA." *Id.* at 370 (citations omitted). Acknowledging that "[w]hile Murphy is correct that some courts have rejected the application of section 230 immunity to certain breach of contract and promissory estoppel claims, many others have concluded such claims were barred because the plaintiff's cause of action sought to treat the defendant as a publisher or speaker of user generated content." *Id.* at 371 (citations omitted). The court rejected Murphy's attempt to rely on *Barnes*, where the Ninth Circuit's decision to except Section 230 immunity related to a Yahoo employee's personal promise to plaintiff that they would remove the challenged content, not the company's commercial terms of service. *Id.* at 372-73. Rejecting a variety of other arguments as well, the court found Murphy's claims barred by Section 230. *Id.* at 377.

Likewise, in *Federal Agency of News LLC v. Facebook, Inc.*, 395 F. Supp.3d 1295 (N.D. Cal. 2019), plaintiff alleged Facebook breached its terms of service when it removed its Facebook page and blocked its content. *Id.* at 1306. Citing *Barnes* and *Rommates*, the *Federal Agency of News* court summarily foreclosed plaintiff's claim under Section 230 as targeting inherently publishing activity. *Id.* at 1306-07. "[I]t is 'immaterial whether [the] decision comes in the form of deciding what to publish in the first place or what to remove among the published material.'" *Id.* (quoting *Barnes*, 570 F.3d at 1102 n.8). Rather, "'activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230' of the Communications Decency Act." *Id.* at 1307 (quoting *Rommates*, 521 F.3d at 1163). The court consequently dismissed plaintiff's contract claim. *Id.* at 1308. *See also* Lancaster *v. Alphabet, Inc.*, Case No. 15-cv-05299-HSG, 2016 WL 3648608 (Jul. 8, 2016 N.D. Cal.) (holding "that § 230 of the CDA prohibits any claim arising from Defendants' removal of Plaintiff's videos" allegedly in violation of the covenant of good faith and fair dealing).

These cases demonstrate why Section 230 immunizes YouTube from Doe's breach of contract claim in this case. Here, Doe alleges that: (1) he "reviewed YouTube's terms of service agreement," (Am. Compl. at 3); (2) he "submitted a report to YouTube LLC to remove the [DeLuca] video," (*Id.*); (3) "YouTube LLC failed to remove the content," (*Id.*); and (4) "YouTube LLC failed to adhere to its own terms of service when it failed to remove the reported video." (*Id.* at 5.) As the cases above make clear, Doe's allegations, while framed as a breach of contract claim, nevertheless go to the heart of YouTube's actions as a publisher – Doe complains that YouTube published DeLuca's videos when it should not have. *Calise*'s plain language shows that Section 230 applies to this sort of allegation that would "oblige[] the defendant to 'monitor third-party content'—or else face liability—then that too is barred by § 230(c)(1)." *Calise*, 103 F.4th at 742.

Even aside from Section 230, Doe's contract claim does not survive rule 12(b)(6) because YouTube's ToS do not create promises which it could have breached in the way that Doe alleges. In *Caraccioli v. Facebook, Inc.*, 167 F. Supp.3d 1056 (N.D. Cal. 2016), plaintiff sued Facebook for failing to remove an allegedly impostor account depicting plaintiff in compromising activities. *Id.* at 1060. Plaintiff claimed that Facebook's refusal to remove the account until after plaintiff threatened suit breached its terms of service. *Id.* at 1061, 1064. The court, however, found that "while Facebook's Terms of Service place restrictions on users' behavior, they do not create affirmative obligations." *Id.* at 1064 (citation omitted). As a result, his breach of contract claim failed. *Id.* In addition, the court found that Facebook had immunity under Section 230 in any event. "Liability based on that sort of vicarious responsibility" where plaintiff contended that "Facebook should be deemed responsible for the account because it reviewed it and decided not to remove it" "is exactly what §2320(c) seeks to avoid." *Id.* at 1066 (citing *Roommates*, 521 F.3d at 1163).

In this case, YouTube's ToS likewise make no affirmative obligations of the sort Doe alleges it breached. Doe's most direct allegation in this regard reads: "YouTube LLC failed to adhere to its own terms of service when it failed to remove the reported video." (Am. Compl. at 5.) Yet YouTube's ToS says only that, "we reserve the right to remove or take down some or all of such Content in our discretion." (YouTube Mot. Ex. A at 10.) Even its promise that it "will notify you with the reason for our action" contains three "unless" clauses qualifying that obligation, not applicable here since Doe challenges YouTube's failure to remove the DeLuca videos. YouTube further disclaims in all capital letters: "WE DON'T MAKE ANY WARRANTIES ABOUT: (A) THE CONTENT PROVIDED THROUGH THE SERVICE; (B) THE SPECIFIC FEATURES OF THE SERVICE, OR ITS ACCURACY, RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS . . . ." (*Id.* at 13.) As a result, even without Section 230's protections, Doe's breach of contract claim fails because it does not identify any promise YouTube breached.

### e. *Doe's Motions for Late Filing and Sur-Replies*

In reaching today's decision, the court has reviewed and considered all of Doe's late filed papers and unpermitted sur-replies. The court, therefore, grants Doe's motions to accept his late filings and will allow his sur-replies retroactively for purposes of this decision.

## C. Order

For the foregoing reasons, the court (a) GRANTS DeLuca's motion to dismiss (Mot. #9); (b) GRANTS YouTube's motion to dismiss (Mot. #12); and (c) GRANTS Doe's Motion to Accept Late Filing (Mot. #14), Motion for Leave to File Sur-reply (Mot. #15) and Motion for Leave to File Supplemental Memo of Law (Mot. #16).

Electronically signed pursuant to V.R.E.F. 9(d) on December 11, 2025.

Colin Owyang
Superior Court Judge